Joey and Sheila SCOTT

v.

DELMAR OFFSHORE SERVICES, INC.,
Delmar Operating, Inc., Delmar Operating, Inc., (P.M.), and Delmar Petroleum,
Inc.

v.

PRODUCERS ASSISTANCE
CORPORATION.

Civil Action No. G–95–283.

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 29, 1996.

Ernest H. Cannon, Ernest Cannon & Associates, Houston, TX, for Joey Scott.

David Edward Black, Griggs & Harrison, Houston, TX, Craig V. Depew, Clark Depew and Siess, Houston, TX, Jana Hale Woefel, Griggs & Harrison, Houston, TX, for DelMar Offshore Services, Inc., DelMar Operating, DelMar Operating, Inc. (P.M.).

Craig V. Depew, Clark Depew and Siess, Houston, TX, Jana Hale Woefel, Griggs & Harris, Houston, TX, for DelMar Petroleum, Inc.

Keith Edward Coulter, Andrews Myers & Donaldson, Houston, TX, for Producers Assistance Corporation.

### ORDER

KENT, District Judge.

Plaintiffs filed this personal injury action on May 26, 1995. Defendant DelMar Operating, Inc. ("DelMar") filed a Third–Party Complaint against Producers Assistance Corporation ("PAC") on August 16, 1995, seeking indemnification from PAC in the event that DelMar was held liable for Plaintiffs' damages. At a Scheduling Conference on March 5, 1996, the DelMar Defendants announced a settlement with the Plaintiffs, and the Court ordered DelMar and PAC to present the remaining indemnity claim for consideration via dispositive motions. Now before the Court are PAC's Motion for Summary Judgment of April 3, 1996 and DelMar's Motion for Summary Judgment of April 4, 1996. For the reasons set forth below, DelMar's Motion for Summary Judgment is **DENIED** and PAC's Motion for Summary Judgment is **GRANTED.**

### I. Factual Background

Plaintiff Joey Scott was allegedly injured when he slipped and fell down a stairway on an offshore platform, identified as Eugene Island 199–A ("EI–199–A"). Plaintiff claimed he slipped on food debris, grease, and oil that was present at the top of the stairwell as a result of an illegal practice of throwing food waste overboard into navigable waters. At the time of the incident, Plaintiff was an employee of PAC and worked as a member of the galley crew aboard EI–199–A. EI–199–A was located on the outer Continental Shelf off the coast of Louisiana and was operated and partially owned by DelMar.

DelMar and PAC were parties to a Master Service Agreement signed in February 1994, pursuant to which PAC was to provide certain services to DelMar. As far as the Court

can tell from the pleadings, furnishing the galley crew of which Plaintiff was a member was one of the services provided by PAC. The Master Service Agreement contains an indemnity clause which provides:

> Contractor shall defend, indemnify and save Company, its officers, directors, employees and joint owners harmless from and against all claims, demands and causes of action brought or asserted by any employee of Contractor or any of Contractor's subcontractors or their employees (and [or] any spouse and [or] relative of any employee), on account of bodily injury or death, resulting directly or indirectly from the operations of Contractor, work performed under this Agreement, without regard to (a) the negligence of Company, its officers, directors, employees, joint owners, agents or subcontractors, (b) the unseaworthiness of any vessel or (c) any defective condition of property of Company, regardless of whether the negligence, unseaworthiness or defective condition be active or passive, primary or secondary. The indemnity described in this Paragraph 5 extends liability assumed by Company under contract.

(Master Service Agreement, p. 2, ¶5). In the Master Service Agreement, DelMar is identified as "Company," and PAC is identified as "Contractor." The Master Service Agreement also contains a choice of law clause, which provides that the agreement and the legal relationship between the parties is to be interpreted and construed pursuant to Texas law unless federal maritime law applies, in which case federal maritime laws would govern. (Master Service Agreement, p. 6, ¶21).

It is these two clauses that are the subject of the controversy between DelMar and PAC. DelMar contends that Texas law should govern the dispute and that the indemnification clause is valid and enforceable under Texas law as well as Louisiana law, in the event that it applies. PAC contends, on the other hand, that Louisiana law governs and that the indemnification clause is void as a matter of law under the Louisiana Oilfield Anti–Indemnity Act ("LOAIA"), La.Rev.Stat. Ann. § 9:2780 (West 1996). Both parties seek summary judgment on the issue of whether PAC must indemnify DelMar pursuant to the indemnification clause in the Master Service Agreement.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Issues of material fact are genuine only if they require resolution by a trier of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In other words, the Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont De Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). To meet this burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56 (quoting Fed.R.Civ.P. 56(e)). Summary judgment should be granted only if the evidence indicates that a reasonable fact-finder could not find in favor of the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

## III. Discussion

In order to ascertain the validity and enforceability of the indemnification clause, the Court must first determine what law applies. DelMar argues that Texas law should govern the dispute, and largely bases its argument on concerns of equity. In DelMar's view, Texas law should govern because both parties are Texas corporations, both parties chose Texas law to apply to their agreement, and the contract was negotiated in Texas. PAC argues that these factors are not controlling but rather that Louisiana law must be applied pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C.A. §§ 1331–1333 (West 1986). In contrast to DelMar's argument, which is well prepared and equitably enticing, PAC's contention is anchored by firm, binding legal precedent.

 The Court is obligated to follow this precedent and concludes after a review of applicable caselaw and statutory authority that this case falls under the purview of OCSLA. OCSLA was enacted "to define a body of law applicable to the seabed, the subsoil, and the fixed structures ... on the outer Continental Shelf," *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969), and provides in relevant part:

(1) The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State....

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....

43 U.S.C.A. § 1333(a) (West 1986). Thus the law of the State adjacent to a fixed platform on the outer Continental Shelf acts as the Federal law to be applied in a dispute involving such a platform. In order for State law to apply, however, certain conditions must be met. Specifically, the Fifth Circuit has held that for adjacent State law to apply as surrogate Federal law under OCSLA, three conditions must be met: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto)[;] (2) Federal maritime law must not apply of its own force [;] (3) The state law must not be inconsistent with Federal law." *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir.), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990). The Court finds that all of these conditions are met in this case.

As discussed above, the underlying accident in this case occurred on an offshore platform known as EI–1999–A. It is undisputed that EI–199–A is a fixed structure attached to the seabed on the outer Continental Shelf for the purpose of developing or producing natural resources. As such, it is a situs covered by OCSLA. Consequently, the first prong of the *PLT* test is met in this case because the controversy arose on a situs covered by OCSLA.

 The Court also finds that the second prong of the *PLT* test is satisfied in that maritime law does not apply of its own force in this case. It is well established that maritime law only applies in "those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d

1223, 1231 (5th Cir.1985). In ascertaining whether the subject matter of the controversy is maritime in nature, the Court must look to the contract at issue to determine whether "it has a sufficient maritime nexus apart from the fact that the situs of performance is in navigable waters." *Hollier v. Union Texas Petroleum Corp.*, 972 F.2d 662, 665 (5th Cir.1992) (citing *Laredo Offshore*, 754 F.2d at 1230). The Fifth Circuit has developed the following six-factor test for determining whether a contract is maritime:

> 1) what does the specific work order in effect at the time of injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters[?] 4) to what extent did the work being done relate to the mission of that vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of injury?

*Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990). In applying these factors to the case at bar, the Court is limited to the information provided by the parties, which is regretfully sparse and vague regarding exactly what services PAC performed for DelMar under the Master Service Agreement.

▮ Relying on the information it does have, however, the Court finds the contract between PAC and DelMar to be nonmaritime in nature. Plaintiff was a member of the galley crew assigned to work aboard platform EI–199–A, which is not a vessel. The nature of the platform as a fixed structure militates against the application of maritime law. Moreover, the principal work of Plaintiff was that of a galley hand, which the Court assumes involved basic kitchen work and other housekeeping duties. While Plaintiff may have been a good cook (and therefore held in high esteem by this Court), this type of work has no particular maritime flavor. Rather, it is a type of work performed daily onshore, in myriad enterprises having nothing to do with the maritime industry. Therefore, given the totality of the circum-

stances, the Court concludes that the contract for "services" between PAC and Del-Mar has no sufficient maritime nexus to take it out of the purview of adjacent State law and place it within the ambit of Federal maritime law.

The Court further concludes that the third prong of the *PLT* test is met in that the adjacent State law of Louisiana regarding the enforceability of indemnification clauses is not inconsistent with Federal law. *See Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1528 (5th Cir.1996) ("We find nothing in the LOAIA inconsistent with federal law"); *Matte v. Zapata*, 784 F.2d 628, 630 (5th Cir.) (rejecting the argument that LOAIA conflicts with federal common law), *cert. denied*, 479 U.S. 872, 107 S.Ct. 247, 93 L.Ed.2d 171 (1986); *Rigby v. Tenneco Oil Co.*, 607 F.Supp. 1247, 1250 (E.D.La.1985) (finding "no conflicting applicable federal law with regard to a platform owner's right to seek indemnity").

Because all three parts of the *PLT* test regarding the applicability of State law under OCSLA are met in this case, the Court is confident in applying the law of the adjacent State to this controversy. It is undisputed that Louisiana is the adjacent state to platform EI–199–A; therefore, its law shall guide this Court in its decision. The Court looks to Louisiana law despite the Texas choice of law clause in the Master Service Agreement. While a contractual choice of law provision is one factor that the Court considers in determining applicable law, it appears that OCSLA is a trump card in the game of choice of law. *See PLT Eng'g*, 895 F.2d at 1050 ("We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary."); *Matte*, 784 F.2d at 631 (concluding that a choice of law provision in a Master Service Agreement "violates federal policy expressed in the Lands Act, which seeks to apply the substantive law of the adjacent state to problems arising on the Shelf").[1]

---

1. To its credit, DelMar identifies and acknowledges this precedent, which runs counter to its

argument that Texas law should govern the dispute. The Court commends DelMar's counsel

■ Having established that Louisiana law controls this dispute, the Court now turns its attention to the applicable Louisiana law to determine whether the indemnification clause is valid and enforceable. Louisiana has a longstanding policy against enforcing indemnity agreements in situations in which there is negligence or fault on the part of the indemnitee. *See* La.Rev.Stat.Ann. § 9:2780(A) (West 1996). LOAIA provides in relevant part:

> Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnity against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

*Id.* § 9:2780(B). At issue in this case is whether this section of LOAIA, which voids certain indemnity agreements, applies to the Master Service Agreement between DelMar and PAC. The Fifth Circuit has developed a two-part test for determining the applicability of LOAIA. First, "there must be an agreement that 'pertains to' an oil, gas or water well." *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 991 (5th Cir.1992). Second, the agreement must concern " 'operations related to the exploration, development, production, or transportation of oil, gas, or water.' " *Id.* Only if these two conditions are satisfied does LOAIA operate to invalidate an indemnity provision contained in or collateral to the agreement. *Id.*

■ The crux of the dispute in this case is whether the agreement between DelMar and PAC "pertains to a well." Helpfully, the Fifth Circuit provides another multifactor test for determining whether certain agreements and activities "pertain to a well" so that they fall under the coverage of LOAIA. These ten factors, known as the *Transco* factors, are as follows:

(1) whether the structures or facilities to which the contract applies or with which it is associated, e.g. production platforms, pipelines, junction platforms, etc. are part of an in-field gas gathering system;

(2) what is the geographical location of the facility or system relative to the well or wells;

(3) whether the structure in question is a pipeline or is closely involved with a pipeline;

(4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;

(5) whether the pipeline is a main transmission or trunk line;

(6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

(7) what is the purpose or function of the facility or structure in question;

(8) what if any facilities or processes intervene between the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;

(9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;

(10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

*Transco,* 953 F.2d at 994–95.

■ In applying these factors to the case at hand, the Court finds that they strongly militate toward a finding that the agreement "pertains to a well" and is governed by LO-

---

for the honesty of this argument and appreciates that counsel does not attempt to mislead the Court by hiding or ignoring contrary authority.

The Court notes that this forthrightness reflects well on counsel's integrity and credibility before this Court.

AIA. The platform to which the Master Service Agreement applies and on which Plaintiff was injured, EI–199–A, functions as an in-field gas gathering system. The platform services four wells, which are located only 4/10 to 6/10 of a mile away. The platform is closely involved with pipelines in that flow lines bring the "raw" oil and gas in from the wells to the platform and oil and gas pipelines carry the cleaned and processed gas out of the platform. The lines flowing into the platform pick up oil and gas product from these four wells, which is not commingled until it reaches the platform. The gas pipeline running from the platform is a main transmission line while the oil pipeline is a trunk line. Compressors, regulating stations, and processing facilities are located on the platform itself. The primary function of the platform appears to be gathering oil and gas production from the surrounding wells and cleaning it before sending it to sale. It appears from the facts given that there are no intervening facilities or processes between the various wellheads and the platform, but rather that the product is processed/cleaned once it reaches the platform. DelMar operates and partially owns the platform and also holds an ownership interest in the serviced wells. For these reasons, the Court finds that the agreement between DelMar and PAC as it relates to the services performed on platform EI–199–A "pertains to a well," thus satisfying the first part of the test for the applicability of LOAIA. In so finding, the Court is guided by *Broussard v. Conoco, Inc.,* 959 F.2d 42 (5th Cir.1992), which involved the application of LOAIA to a contract under which a catering company provided catering services to Conoco employees on an offshore quarters platform that was adjacent to a production platform. The Plaintiff in *Broussard* was a galley hand who was injured when he fell off a stool while changing linens. The Fifth Circuit applied the relevant *Transco* factors and concluded that the catering contract pertained to a well and invoked the application of LOAIA. *Id.* at 45. The Court also found that the second part of the test regarding the applicability of LOAIA was satisfied because "the catering contract concern[ed] 'operations related to

... production,' within the broad scope accorded 'operations' under the LOAIA." *Id.*

Similarly, the Master Service Agreement between DelMar and PAC concerns "operations related to the production of oil and gas" because the services performed by PAC on platform EI–199–A were essential to the function and operation of a manned offshore platform. *Cf. Copous v. ODECO Oil & Gas Co.,* 835 F.2d 115 (5th Cir.1988) ("Because living quarters were essential to operation of the manned platform, ... a contract to renovate those living quarters is 'related' to the production of oil and gas and within the scope of the OIA...."). Accordingly, the Court finds that LOAIA applies to the agreement and voids the indemnification clause contained therein. Consequently, PAC is not obligated to indemnify DelMar for the costs associated with the defense and settlement of Plaintiff's personal injury claim.

For the reasons stated above, Defendant DelMar's Motion for Summary Judgment is **DENIED** and Third–Party Defendant PAC's Motion for Summary Judgment is **GRANTED**. Accordingly, each and every claim asserted by DelMar against PAC is hereby **DISMISSED WITH PREJUDICE**. The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date. The parties are also **ORDERED** to file nothing further on these issues in this Court, including motions to reconsider and the like. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

### FINAL JUDGMENT

For the reasons set forth in the Order issued by the Court this date, Defendant DelMar Operating, Inc.'s Motion for Summary Judgment is **DENIED** in its entirety, and Third–Party Defendant Producers Assistance Corporation's Motion for Summary Judgment is **GRANTED** in its entirety. Each and every claim asserted by DelMar Operating, Inc. against Producers Assistance Corporation is hereby **DISMISSED WITH PREJUDICE**. Each party is **ORDERED** to

bear its own taxable costs and expenses incurred herein to date.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**