**CHESAPEAKE OPERATING, INC., Appellant,**

v.

**NABORS DRILLING USA, INC., Appellee.**

**Nabors Industries, Inc., Nabors Drilling USA, Inc., Nabors Loffland Drilling Co., and Nabors Energy Services, Inc., Appellants,**

v.

**Chesapeake Operating, Inc. and Chesapeake Energy Corp., Appellees.**

Nos. 14–00–00173–CV, 14–00–00580–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 21, 2002.

---

**7.** We also note the lien was filed in Victoria County, Texas.

Robert E. Ammons, Maxine D. Goodman, Houston, for appellant (case no. 14–00–00173–CV).

Mark Pharr, Houston, for appellants (case no. 14–00–00580–CV).

Bradley A. Jackson, Elizabeth Wheeler, Mark Pharr, Houston, for appellee (case no. 14–00–00173–CV).

Mark Allen, Houston, for appellees (case no. 14–00–00580–CV).

## MAJORITY OPINION

SCOTT BRISTER, Chief Justice.

Two personal injury claims emerged from a drilling site in a Louisiana wood. Both followed the strangely well-worn path to trial courts in Texas. There, the tangle of Texas and Louisiana oilfield indemnity statutes led two very experienced trial judges to split results, and produced a similar split in this Court on both appeals. With the help of a specially appointed eleventh justice, we find Texas law has the better claim, and follow it for the reasons described below.

The applicable facts are undisputed. In December 1996, Chesapeake Operating, Inc. contracted with Nicklos–Hinton Drilling Company to drill an oil well in Vernon Parish in western Louisiana. Less than a month later—before any injuries occurred—Nabors Industries acquired Nicklos–Hinton, and all rights and obligations under the contract were assigned to Nabors Drilling USA, Inc. (with Chesapeake's consent). Nabors and Nicklos–Hinton were both Texas corporations, Chesapeake an Oklahoma corporation. It appears from the contracts and correspondence that each party negotiated and signed these agreements in its home state.

The contract was a standard form daywork drilling contract supplied by the International Association of Drilling Contractors (IADC). It contained mutual indemnity provisions protecting each party against suits by the other's employees or subcontractors, regardless of who was at fault.[1] Each party agreed to obtain $1 million in insurance to back up these indemnities. The contract also contained a "Governing Law" paragraph in which the parties agreed that:

> This contract shall be construed, governed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the laws of _Texas_.

[blank typed-in in original].

Chesapeake hired several subcontractors to perform drilling-related services at the well, including Reeled Tubing, Inc. ("RTI"), a company based in Louisiana, and Quality Pressure Testing ("QPT"), a

---

1. The relevant language of the provisions has been quoted in several other cases. _See, e.g., Ken Petroleum Corp. v. Questor Drilling Corp.,_ 24 S.W.3d 344, 351–52 nn. 16–17 (Tex.2000).

Because these cases do not turn on the particular language of the indemnity clauses, we refrain from including all 738 words here.

Texas company. On February 15, 1997, Danny Alms, a Texas resident employed by RTI, injured his shoulder and back while working at the well.[2] Four days later, Dennis Fritz, a Texas resident employed by QPT, slipped, fell, and suffered injuries at the well.

From this common starting point, the paths of Alms and Fritz diverged. Fritz filed suit against Chesapeake, Nabors, and others in Harris County, Texas; Alms sued Chesapeake, Nabors, and others in Brazoria County, Texas. Since both men worked for Chesapeake's subcontractors, Nabors filed cross-actions against Chesapeake in both suits seeking indemnification for all liability and defense costs incurred. In nearly identical motions, Nabors moved for summary judgment on the cross-claims.

The *Alms* court applied Texas law, granted Nabors' indemnity claim, and severed that claim from the rest of the suit for this appeal. The *Fritz* court first tried the underlying claims (resulting in a take-nothing judgment against Fritz),[3] then applied Louisiana law, and denied Nabors' indemnity claim for defense costs.

On appeal, a panel of this Court initially reversed the *Alms* court. Thereafter, Nabors' appeal in *Fritz* was submitted to a different panel (without mention by either party that an identical case was pending), and Nabors moved for rehearing in *Alms*.[4] We granted Nabors' motion for rehearing, consolidated the two appeals, and now withdraw the panel opinion and issue this en banc opinion. Our review of the trial courts' opposite rulings on essentially the same summary judgment evidence is *de novo*. *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996) (stating which state's law governs is a question of law).

## I. The Purpose of Indemnities

Before considering each state's indemnity laws, we consider briefly the clauses they limit. At first glance, it appears suspect that an innocent party would agree in advance to pay the costs of a liable party, no matter what happens. Yet indemnity clauses are widespread in oilfield contracts (hence their inclusion in IADC form contracts). Both operators and drilling contractors have urged the Texas Legislature to encourage indemnity provisions under certain conditions.[5] A comparison with sit-

---

**2.** Although our record does not specifically indicate Alms's residence on the day of his accident, his testimony indicates he resided and worked in Texas for some years both before and after the accident.

**3.** Although the jury found both Nabors and Fritz negligent, because it assessed eighty percent of the fault to Fritz, he was barred from recovering against Nabors. *See* TEX. CIV. PRAC. & REM.CODE § 33.001 (barring recovery by claimants whose percentage of responsibility exceeds fifty percent). The jury found Chesapeake (which had settled with Fritz prior to the trial) not negligent. *See id.* at § 33.003 (requiring jury question to include settling parties).

**4.** The parties have also engaged in related litigation in federal court in Louisiana. *Old Republic Ins. v. Chesapeake Operating Inc.*,

No. 991270, 2000 WL 33399807 (W.D.La. Nov.1, 2000) (not designated for publication). There, QPT's insurer sought a declaration that Louisiana law barred enforcement of mutual indemnity clauses between QPT and Chesapeake with respect to the *Fritz* case. Although the Memorandum Ruling applied Louisiana law in an alternative holding, the federal court held that (1) indemnity for Chesapeake was moot because it had settled with Fritz, and (2) indemnity for Nabors was unavailable as it had no indemnity contract with QPT.

**5.** *See Ken Petroleum*, 24 S.W.3d at 349 (citing legislative history that operators and contractors requested amendment of Texas Oilfield Anti–Indemnity Act to make it less restrictive).

uations in which there is no indemnity suggests why.

Drilling sites, of course, can be hazardous places. When injuries occur, it is often difficult to tell who is at fault due to the complex nature of the enterprise, the large number of subcontractors usually involved, difficult questions regarding the right to control,[6] and the intersection of premises liability and agency law in drilling operations.[7] As a result, there are usually two disputes to resolve—one pitting the injured party against all those potentially responsible, and another among the defendants to allocate fault and the resulting burden of any settlement or judgment.

Mutual indemnity provisions (if routinely enforced) eliminate the latter dispute. In the standard drilling contract, they allocate costs and liability according to who hired the injured party, not who caused the accident. This eliminates liability and coverage disputes between drilling operators and contractors. In the event of a lawsuit, they need not file cross-actions for contribution, conduct discovery between themselves, or even hire separate lawyers. This may result in a "united front" against a plaintiff, but it may also work to a plaintiff's advantage by shifting money from duplicative defense costs to settlement funds.

But indemnity provisions often fall short of this purpose. This Court and others have been kept busy in recent years resolving indemnity disputes.[8] In the choice-of-law analysis that follows, it must be kept in mind that these clauses will never accomplish their primary purpose as long as there is substantial uncertainty about whether they will be enforced.

## II. The Conflicting Indemnity Laws

The parties disagree whether their indemnity clauses should be judged by Texas or Louisiana law.[9] They also disagree whether it makes any difference. As we need not decide which law applies if it makes no difference, we first review the law of each state.

### A. Texas Law

■ Under Texas law, oilfield indemnity clauses are generally void. Tex. Civ. Prac. & Rem.Code § 127.003. But there are several exceptions, including one for indemnities that are mutual and supported by liability insurance. *Id.* § 127.005; *Ken Pe-*

6. *See, e.g., Koch Ref. Co. v. Chapa,* 11 S.W.3d 153, 157 (Tex.1999); *Tovar v. Amarillo Oil Co.,* 692 S.W.2d 469, 470 (Tex.1985).

7. *See, e.g., Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 527 (Tex.1997).

8. *See, e.g., Ken Petroleum,* 24 S.W.3d at 346 (reversing two appellate courts and holding indemnity obligations enforceable to extent coverage and dollar limits applied equally); *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 511 (Tex.1993) (holding indemnity void because it was not conspicuous); *Getty Oil Co. v. Insurance Co. of N. America,* 845 S.W.2d 794, 804 (Tex.1992) (holding Texas Oilfield Anti–Indemnity Act inapplicable to additional insured provision); *Maxus Exploration Co. v. Moran Bros., Inc.,* 817 S.W.2d

50, 57 (Tex.1991) (holding Kansas law applied to indemnity); *Amerada Hess Corp. v. Wood Group Prod. Tech.,* 30 S.W.3d 5, 13 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (affirming indemnity for settlement amount as reasonable); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 20 S.W.3d 119, 128 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding Texas Oilfield Anti–Indemnity Act inapplicable to suit by gasoline terminal against trucking company); *Ard v. Gemini Exploration Co.,* 894 S.W.2d 11, 15 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (holding particular indemnity inapplicable to personal injury claims).

9. Although Chesapeake is an Oklahoma corporation, neither party asserts that Oklahoma law applies.

*troleum Corp. v. Questor Drilling Corp.,* 24 S.W.3d 344, 346 (Tex.2000). Additionally, indemnity clauses must meet certain fair notice requirements. *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 509 (Tex.1993). Chesapeake does not dispute that these clauses meet the former, but argues they fail to comply with the latter.

 To give fair notice, an exculpatory indemnity clause must be express and conspicuous. *Id.* at 508–09. Compliance with these requirements is a question of law for the court. *Id.* at 510. The operative indemnity language here meets the "express" requirement, as it is identical to words the Texas Supreme Court has approved. *See Maxus Exploration Co. v. Moran Bros., Inc.,* 817 S.W.2d 50, 56 (Tex. 1991) (holding indemnity "without limit and without regard to the cause or causes thereof or the negligence of any party or parties" met express negligence test).[10] The second requirement—conspicuity—is immaterial if Chesapeake had actual knowledge of the indemnity clauses. *Cate v. Dover Corp.,* 790 S.W.2d 559, 561–62 (Tex.1990). Chesapeake did, because its representative initialed a specific change to the indemnity provisions in this contract. We find Nabors' indemnity claim would be enforceable under Texas law.

### B. Louisiana Law

By a similar statute, Louisiana declares oilfield indemnity clauses void and unenforceable if they operate in favor of a negligent party. La.Rev.Stat. Ann. § 9:2780(B) (West 1991). Nabors argues this statute applies only to contractors domiciled in Louisiana, and thus does not apply here. But the statute's language is

not so limited. *Id.* (providing that "[a]ny provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water ... is void and unenforceable").

In the *Fritz* case, the jury found Nabors negligent (though only twenty percent at fault). In the *Alms* case, we presume a jury may find Nabors negligent, since Nabors' motion failed to prove it was not negligent as a matter of law. In either case, Nabors' indemnity claim would be unenforceable under Louisiana law.

### C. Choosing the Law

Because of these differences, this appeal turns on which state's law applies. In determining the law applicable to oilfield indemnity clauses, Texas courts look to sections 187 and 188 of the Restatement (Second) of Conflict of Laws. *Maxus,* 817 S.W.2d at 53. As relevant for this appeal, those sections provide:

- In a contract *without* an express choice of law, indemnity is governed by the law of "the state which, with respect to that issue, has the most significant relationship to the transaction," applying the principles stated in Restatement section 6 to the contacts listed in Restatement section 188(2). *See Maxus,* 817 S.W.2d at 53; Restatement (Second) of Conflict of Laws § 188 (1971).

- In a contract *with* an express choice of law, indemnity is governed by the law chosen by the parties unless (1) there is a state with a more significant relationship to the transaction (applying section 188), *and* (2) applying the chosen law would contravene a fundamental policy of that state, *and* (3) that state has a

---

10. Because of this express holding, the court's final note that "[w]e express no opinion on whether the indemnity provisions at issue would be valid under Texas law" must refer

only to the question whether the clauses were supported by mutual insurance contracts. *Maxus* at 56–58.

materially greater interest in the determination of the particular issue. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex.1990); Restatement § 187(2)(b).[11]

Because the parties here expressly chose Texas law, we apply the latter provision. But because the latter incorporates the former, we begin our analysis with it.

### III. Section 188: The Most Significant Relationship

#### A. The Contacts

■ Restatement section 188 provides that "an issue in contract [is] determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties," taking into account the following five contacts:

(1) the place of contracting,

(2) the place of negotiation of the contract,

(3) the place of performance,

(4) the location of the subject matter of the contract, and

(5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

Restatement § 188(2).

■ Chesapeake argues the first, second, and last contacts are inconclusive because they are split between two states—Texas and Oklahoma. But we are not comparing the law of Texas and Oklahoma, only Texas and Louisiana. While only one party is domiciled in Texas and negotiated and signed the contract there, that is one more than can be said for Louisiana. Moreover, the parties agree that—with respect to enforcement of these indemnities—the laws of Texas and Oklahoma would reach the same result.[12] Thus, considering Texas to be the state of domicile, place of business, and place of negotiation and contracting complies with (or at least does no harm to) Oklahoma's interests as well.

■ The third and fourth contacts—the place of performance and the location of the subject matter of the contract[13]—are more difficult to pin down. In *Maxus Exploration Co. v. Moran Bros.*, the Texas

---

11. The Restatement alternatively provides that an express choice of law will be enforced if the issue is one the parties could have resolved by explicit agreement. Restatement § 187(1). Here they could not, because Louisiana law (if applicable) would make these indemnity agreements void. *See DeSantis*, 793 S.W.2d at 678. The Restatement also refuses to respect the parties' choice of law if the chosen state has no substantial relationship to the parties or the transaction. Restatement § 187(2)(a). Here Texas does, as it is Nabors' principal place of business and the locus of part of the contract negotiations. *See DeSantis*, 793 S.W.2d at 678.

12. Oklahoma enforces oilfield indemnity clauses if they (1) are unequivocally clear, (2) result from an arm's-length transaction between parties of equal bargaining power, and (3) do not violate public policy. *Kinkead v. Western Atlas Int'l, Inc.*, 894 P.2d 1123, 1127

(Okla.Ct.App.1993) (enforcing oilfield indemnity). Because the *Kinkead* court enforced an oilfield indemnity clause, and because Chesapeake designated Oklahoma law to govern its indemnity contract with QPT, such clauses do not appear to violate Oklahoma public policy.

13. The location of the contract's subject matter is "significant" when "the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk." *See* Restatement § 188 cmt. e. Assuming it applies to service contracts, it does not appear to differ from the "place of performance." *See DeSantis*, 793 S.W.2d at 679 (finding both factors pointed to Texas in services contract performed there); *Diesel Serv. Co. v. AMBAC Int'l Corp.*, 961 F.2d 635, 641 (7th Cir.1992), overruled on other grounds by *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 974–75 (7th Cir.1999) (finding analysis same for both factors under § 188).

Supreme Court considered what law applied to an oilfield indemnity clause when the parties made no choice of law in their contract. 817 S.W.2d at 53. The court held the place of performance was of "paramount importance" in service contract cases. *Id.; see also* RESTATEMENT § 196.

But as the court noted, there are two possible meanings of "the place of performance": (1) where the drilling services were performed, and (2) where the indemnity obligation was performed (by defending against the injured employee's suit). The main performance contemplated by the drilling contract as a whole is the former; but the only disputed performance involved in the two cases before us is the latter. The court and the Restatement tell us that, on occasion, "it is more appropriate to consider the disputed contractual issue separately from the contract as a whole." *Maxus,* 817 S.W.2d at 54; *see* RESTATEMENT Title C Particular Issues, Introductory Note, at 631–32. Because in *Maxus* the performance of both was in Kansas, the court did not have to decide the issue.

■ But we do. Here, the drilling took place in Louisiana, but the suing took place in Texas. Any judgment (in the *Alms* case) would be entered in Texas, the attorneys' fees (sought in both cases) were incurred in Texas, and indemnification between Nabors and Chesapeake would be made to or from Texas. Thus, we must decide whether the state with the most

significant relationship should be determined by looking to the contract as a whole or the indemnity clauses that are disputed.

We believe the latter is the case. While the Texas Supreme Court has not addressed this question again with respect to Restatement section 188, it recently construed identical language in the Restatement concerning choice of law in a tort action. *Compare* RESTATEMENT § 145(1) ("The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties") *with* RESTATEMENT § 188(1) ("The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties"). In *Hughes Wood Products, Inc. v. Wagner,* the supreme court found the lower court's holding (that Texas had the most significant relationship to the parties' business as a whole) was immaterial. 18 S.W.3d 202, 205 (Tex.2000). The proper analysis, the court held, must "consider which state's law has the most significant relationship *to the particular substantive issue to be resolved.*"[14] *Id.* (emphasis in original).

In this appeal, the "particular substantive issue to be resolved" is whether these indemnity clauses are enforceable. Nabors' claim in both cases is for liability and

---

14. Although even Chesapeake cites *Hughes* as dispositive on this point, Justice Wittig finds it inapplicable because the "particular issue" in *Hughes* was covered by a separate section in the Restatement. *Post* at 171–72. In other words, he would separately consider the substantive issue only if it is among the nineteen issues listed in Restatement sections 189 to 207. Neither *Hughes* nor the Restatement suggest any such limitation: "The courts have long recognized that they are not bound to

decide all issues under the local law of a single state.... *Each issue* is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." *See* RESTATEMENT § 188 cmt. d (emphasis added). Moreover, the supreme court in *Maxus* would not have mentioned two options if one (the place of performance of the indemnity) was irrelevant absent its own separate section in the Restatement.

legal services incurred in Texas, not for drilling services performed in Louisiana. Considering only the particular issue in dispute, the place of performance of that obligation was in Texas.[15]

Chesapeake urges us to adopt the other option in *Maxus*—that the place of performance is the state where the drilling services were performed. This whole-contract approach to place of performance makes the particular substantive issue irrelevant. Thus, if this lawsuit concerned financing, insurance coverage, workers' compensation, taxes, transportation, or any other side agreement in the parties' drilling contract, the result would always be the same—Louisiana law governs it all.

Our dissenting colleagues adopt this approach, arguing it will make the law more predictable because contracting parties know in advance where they are drilling, but not where they will be sued. We doubt it was a surprise to these oil companies that an injured Texas resident was likely to sue a Texas company in Texas.[16] But even if this assumption about the parties' expectations is correct here, it certainly will not always be the case. Many oilfield contracts contemplate work in different jurisdictions, or consist of a master service contract that applies to many separate work orders issued over the years for different places.[17] Others concern services that have no single place of performance—such as the transportation of oilfield personnel and products by truck, boat, helicopter, and pipeline. In such cases, the "place of performance" suddenly becomes much less predictable, and subject to after-the-fact arguments about where "most" of the contractual services were performed.

Additionally, using "predictability" to determine the place of performance jumbles the Restatement analysis. The proper approach is to determine the state contacts (such as place of performance) and *then* apply the Restatement's general principles (such as certainty, predictability, and uniformity). Using a single principle to define the state contacts *and* to analyze them makes it serve as both cart and horse.

A narrow focus on only one factor and one part of the contract (the place of performance of drilling) is at odds with the Restatement's approach, which requires a broad consideration of all contacts and interests. The place of performance is only one factor in the choice-of-law analysis, and as discussed in the next section, in our

**15.** Our analysis does not necessarily "divide☐ the law applicable to indemnity and the underlying insuring agreement," as Justice Wittig suggests. *Post* at 182. The Restatement *does not* apply the law of a state where the insured risk is located "when the contract would be invalid under the local law of the state of principal location but valid under the local law of another state with a close relation to the transaction and the parties." *See* RE-STATEMENT § 193 cmt. d. Because Texas has such a close relation, we believe this exception applies.

**16.** We disagree with Justice Frost that by focusing on the indemnity clause (the particular issue), the place of performance "points to no particular state." *Post* at 191. In *Maxus*, there is no indication that at the time of contracting the parties knew they would be sued in Kansas, yet the supreme court considered the defense of an injured worker's suit there as a "performance" pointing to that state. *See Maxus*, 817 S.W.2d at 54. The Restatement does accord less weight to contacts to the degree they are "uncertain or unknown" at the time of contracting. *See* RESTATEMENT § 188 cmt. e. But it discounts them only when they are "purely fortuitous." *Id.* (suggesting place of contracting is of no significance when one party happens to mail acceptance from a railroad station).

**17.** *See, e.g., Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313, 315 (5th Cir.1990) (holding contract in that case consisted of both blanket agreement and later work orders).

view it is not necessarily determinative or even the most important factor. What is determinative is which state has the most significant relationship *with respect to the indemnity issue*. In this case, performance of the drilling was completed a long time ago. For the last four years, the only fight has been over performance of the indemnities, a fight conducted entirely in Texas. We do not see why Louisiana should set the rules for that fight.[18]

### B. Evaluating the Contacts

▪ Next, we must evaluate these contacts according to their relative importance with respect to the particular issue in the cases before us. *See* RESTATEMENT § 188(2). As noted, the domicile of the parties, place of contracting, and place of negotiation all point to Texas; so do the remaining contacts with respect to the particular issue to be resolved (rather than the contract as a whole). We evaluate

these contacts not by their number, but by their quality. *Minnesota Mining & Mfg. Co.*, 955 S.W.2d at 856.

▪ As discussed in section IV(A) below, the purpose of both the Texas and Louisiana oilfield indemnity statutes is to prevent large oilfield companies from imposing contracts of adhesion on smaller oilfield contractors. Obviously, a state has a stronger interest in protecting its own citizens than a neighboring state does. Accordingly, "the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power." RESTATEMENT § 188 cmt. c. State and federal courts appear generally to follow this principle, applying the law of the parties' domiciles when considering conflicting indemnity laws.[19]

---

**18.** We also disagree with our dissenting colleagues that the Restatement's focus on the particular issue in dispute will invite forum shopping. It seems very unlikely that many plaintiffs will pick a venue solely to manipulate the enforceability of the defendants' mutual indemnity obligations. Indeed, it is not clear plaintiff's counsel will even know about such clauses before filing suit.

**19.** *See, e.g., Roberts v. Energy Dev. Corp.*, 235 F.3d 935, 943 (5th Cir.2000) (applying Louisiana law to void indemnity owed by Louisiana contractor when most work was performed in Louisiana); *Thomas v. Amoco Oil Co.*, 815 F.Supp. 184, 187 (W.D.La.1993) (applying Louisiana law to void indemnity owed by Louisiana contractor even though all work was performed in Texas); *Lyons v. Turner Constr. Co.*, 195 Ill.App.3d 36, 141 Ill.Dec. 719, 551 N.E.2d 1062, 1063 (1990) (applying Illinois law to void indemnity owed by Illinois contractor even though all work was performed in Texas); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 528 N.W.2d 698, 707 (1995) (applying Michigan law to enforce indemnity between Michigan companies who chose Michigan law, even though all work was performed in Illinois); *Reagan v. McGee Drilling Corp.*, 123 N.M. 68,

933 P.2d 867, 868 (App.1997) (applying Texas law to enforce indemnity between Texas contractors who chose Texas law, even though all work was performed in New Mexico); *Finucane v. Interior Constr. Corp.*, 264 A.D.2d 618, 695 N.Y.S.2d 322, 324–25 (N.Y.App.Div.1999) (applying Oklahoma law to enforce indemnity in favor of Oklahoma contractor when parties chose Oklahoma law, even though all work was performed in New York); *cf. Scott v. DelMar Offshore Servs., Inc.*, 943 F.Supp. 764, 768–69 (S.D.Tex.1996) (applying Louisiana law to void indemnity between Texas companies who chose Texas law because federal Outer Continental Shelf Lands Act required application of Louisiana law); *but see Tucker v. R.A. Hanson Co., Inc.*, 956 F.2d 215, 218–19 (10th Cir.1992) (applying New Mexico law to void indemnity executed in California choosing California law, as all work was performed in New Mexico); *Palmer G. Lewis Co., Inc. v. ARCO Chem. Co.*, 904 P.2d 1221, 1227 (Alaska 1995) (applying Washington law to void indemnity contract because contract was negotiated and performed there, without mentioning domicile of any party); *Donaldson v. Fluor Engineers, Inc.*, 169 Ill.App.3d 759, 120 Ill.Dec. 202, 523 N.E.2d 1113, 1116 (1988) (applying Illinois law to void indemni-

In the most recent and most similar case available, the United States Court of Appeals for the Fifth Circuit held that the domicile of the contracting parties is determinative in an oilfield indemnity choice-of-law analysis. *See Roberts v. Energy Dev. Corp.*, 235 F.3d 935, 943 (5th Cir.2000). In that case—like ours—the oilfield services and injury occurred in Louisiana, and the parties' contract chose Texas law.[20] The court disregarded the parties' law choice because indemnity was sought against a company domiciled in Louisiana. *Id.* at 942–43. The court distinguished one of its previous decisions that applied Texas law to similar facts, noting the difference was that the contracting parties in the prior case were both domiciled in Texas. *Id.* at 943.[21]

In *DeSantis v. Wackenhut Corp.*, the Texas Supreme Court appeared to follow this principle, applying the law of the Texas employee's domicile because Texas law (which restricted noncompetition agreements) was intended to protect him. 793 S.W.2d at 679. But in *Maxus*, the court refused to apply Texas law to construe oilfield indemnities, even though both companies were domiciled in Texas. 817 S.W.2d. at 57. The court instead applied the law where the contract was performed (both the drilling services and the subsequent liability suit), stating it was more plausible the Texas indemnity statute was intended to protect contractors drilling wells in Texas rather than Texas-domiciled contractors when drilling out of state. *Id.* The opinion does not address the cases or Restatement commentary that emphasize domicile.

We do not think the result in *Maxus* applies here for two reasons. First, the Restatement contacts "are to be evaluated according to their relative importance *with respect to the particular issue.*" RESTATEMENT § 188(2) (emphasis added). In *Maxus*, the place of performance outweighed domicile because *all* services (drilling and indemnity) were performed out of state. Here, the indemnity services and domicile are both in Texas; *Maxus* does not suggest the drilling location alone outweighs these two combined, especially with respect to the indemnity issue in dispute.

Second, strong policies underlying contract law (discussed in the next section) operated differently in *Maxus*. There, the contracting companies failed to use the most current drilling contract form, and as a result the indemnity clauses they used were unenforceable. *See* 817 S.W.2d at 52, 56 (noting amendments without expressly finding provisions invalid under Texas law). The supreme court may have favored Kansas law (which would enforce them) on the principle that companies should be held to their bargains. Here,

---

ty owed by Louisiana contractor because all work was performed in Illinois, even though parties chose California law).

**20.** Unlike the cases before us, the personal injury and indemnity claims were all filed in Louisiana. *Roberts*, 235 F.3d at 936. Because both the oilfield and the litigation services occurred in Louisiana (as in *Maxus* ), it did not matter whether the place of performance was the former or the latter. Rather than reading the case for what Justice Frost says it "seems to indicate," *post* at ——, we instead rely on what the Fifth Circuit *said* was decisive—domicile.

**21.** We disagree with Justice Frost's reliance on *Gorsalitz v. Olin Mathieson Chem.Corp.*, 429 F.2d 1033 (5th Cir.1970). That case did not concern oilfield indemnity clauses, and did not address the *Maxus* options for "place of performance" because it was issued before *Maxus*, indeed even before the second Restatement itself was published. It is hard to see why *Gorsalitz* is more persuasive than *Roberts*, as only the latter is (1) a recent application (2) of the current Restatement (3) in the context of the Texas and Louisiana oilfield indemnity statutes.

reaching out to Louisiana law would have the opposite effect, relieving Chesapeake of the indemnity it promised to pay and the insurance coverage it promised to provide.

By giving special weight to domicile, we do not attribute a discriminatory intent to either statute any more than our dissenting colleagues do by construing the statutes territorially. Although they say these laws are defined by "geography"[22] and directed toward "oilfield operations within [each state's] territorial boundaries,"[23] in fact the scope of neither statute is so limited. The actual terms of each statute contain no limitations whatsoever, and thus apply to all oilfield contracts everywhere, regardless of where the company or well is located. The choice-of-law question is whether and under what circumstances these statutes can extend that far; by presuming a territorial reach, our colleagues presume the answer.[24]

The Restatement does not presume that state laws stop at the state line; instead, it focuses on which state's interests are the "most significant." A state without oil or oilfield companies may have an economic interest in curbing unfair bargaining in oil-producing states, but its interest is unlikely to be the most significant. We do not discount Louisiana's interest in fair bargaining between foreign companies. But the relationship between those companies and the states where they regularly conduct such bargaining is simply more significant than that of any number of other states where they may be operating for the moment.

Again, we do not make domicile the sole test; like any other contact, it cannot be taken out of context. It is interesting to speculate whether Louisiana law would apply if Alms or Fritz had sued somewhere else, or if the only Texas domiciliary was an assignee or a subcontractor, but we need not decide those cases here. Nor should a concern for the "mischief" domicile may hypothetically create cause us to overlook the mischief that is right before our eyes—having drafted indemnity clauses and purchased insurance to meet Oklahoma and Texas law, the losing party now wants to undo the result.

## C. Considering the Principles of Restatement Section Six

Finally, we must apply to these weighted contacts the principles listed in Restatement section 6. *See Maxus*, 817 S.W.2d at 54; RESTATEMENT § 188(2). Those principles are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

---

22. *Post* at 187.

23. *Post* at 188.

24. Justice Frost's complaint that our analysis "effectively withdraws protections for Texas contractors working in states that have more stringent anti-indemnity statutes than Texas," *post* at 196, is perplexing, as (1) it is her analysis (not ours) that would do so in this case, and (2) it assumes Texas contractors should be protected from their own agreements and their own legislature.

*Id.* at § 6. In conducting this analysis, we put aside the parties' explicit choice of Texas law, but certainly not the rest of their contract. *See* RESTATEMENT § 188 cmt. b (recognizing that parties expect "the provisions of the contract would be binding upon them," and that this expectation is of "considerable importance").[25]

For the reasons already discussed, we believe the relative policies and interests of Texas and Louisiana (the second and third principles) tip toward Texas, as the state with the strongest interest in fair bargaining by resident businesses. Moreover, Texas has a "strong commitment to the principle of contractual freedom." *Churchill Forge, Inc. v. Brown,* 61 S.W.3d 368, 371 (Tex.2001). We believe this interest in freedom of contract (and its indispensable partner—contract enforcement) outweighs any interest Louisiana has in voiding a contract between foreign companies regarding foreign litigation. And as noted at the outset, the benefit Texas oilfield companies (and Texas appellate courts) gain by avoiding indemnity disputes is lost if enforcement is rendered uncertain every time a work order calls for crossing a state line.

The justified expectations of the parties and the policies underlying contract law (the fourth and fifth principles) also point to Texas. In contract cases, these two usually agree, as "[p]rotection of the justified expectations of the parties is the basic policy underlying the field of contracts." RESTATEMENT § 188 cmt. b; *DeSantis,* 793 S.W.2d at 677. In this case, the parties

explicitly drafted indemnity provisions and purchased insurance to meet Texas law. Neither party expected Louisiana's indemnity statute to apply, unless they had their fingers crossed when they signed. In such circumstances, it would be "unfair and improper" to allow Chesapeake to appeal to Louisiana law to undo the parties' bargain. *See* RESTATEMENT § 6 cmt. g.

Our dissenting colleagues declare these expectations "unjustified" because the parties should have known Louisiana law would apply (though a majority of the Court holds it does not). In other words, this should have been easy for the parties to see, though it has not been so for us.[26] At most, the parties could have known that Louisiana law *might* apply, but this does not explain why any other expectation was not "justified." We would not be protecting the parties' justified expectations by converting this possibility into a certainty, meanwhile converting mutual promises of $1 million in insurance coverage into a mere "hope" or "desire."[27]

This is not a case in which the parties drafted a contract they knew to be illegal; such a *mens rea* would require law that is clearer than this has proved to us. When the law of two states might apply and the law of one would void a contract, the Restatement does not prohibit parties from trying to avoid that result. In the only two illustrations included in section 188, hypothetical parties travel to foreign states to enter or enforce contracts they could not at home; yet both illustrations suggest the contracts should be enforced (at least

---

**25.** Our dissenting colleagues confuse our reliance on the parties' indemnity and insurance agreements with reliance on the choice-of-law provision. The careful reader will note we rely in our section 188 analysis only on the former. One cannot analyze justified expectations or the policies underlying contract law

without looking at what the parties' contract provided.

**26.** There is no evidence that Chesapeake was "physically present" in Louisiana, as suggested by Justice Wittig. *Post* at 185.

**27.** *Post* at 193.

under some conditions) to protect the "justified" expectations of the parties. *See* RESTATEMENT § 188 cmt. e, illus. 1–2.

Certainty, predictability, and uniformity and the needs of the interstate and international systems (the first and sixth principles) also support application of Texas law. Industry and commerce cannot operate in a climate that allows a contracting party who makes a bad bargain to change the terms of a deal at its option. Additionally, while Louisiana law has its occasional peculiarities, they pale in comparison to those of foreign lands where oilfield companies sometimes drill. If Chesapeake is correct that the latter's law always trumps the parties' contract, it will be expensive— sometimes even impossible—to know what the parties' contract is.

Finally, the *Maxus* court held that ease of determination and application of law (the seventh principle) points to applying the law of the state where the injured party brought suit. 817 S.W.2d at 57. Like place of performance of the indemnities, this cannot be known with certainty until the injured party files suit. Nevertheless, it is one of the principles we must apply, and like all the others points to Texas in the cases before us.

Chesapeake urges us to adopt a strict rule that always applies the law of the state where the well is located—a "lex loci drilling situs." The argument is tempting, if only because it would be much easier to apply than the factors, principles, and balancing of the Restatement. But as discussed above, that will not always be the case. More important, it is not Texas law. For better or worse, the Supreme Court

has adopted the Restatement approach, and we must follow the balancing act it requires.

Finally, while the Restatement analysis may create uncertainty in some cases, it certainly did not do so here. Chesapeake can hardly be shocked that Texas law applies, as the indemnity clauses and insurance coverage were specifically drafted to meet Texas law. Moreover, if uncertainty is to be decisive, that goal is often best attained (as the Restatement itself states) by letting the parties choose the law that governs their relations, and giving judicial respect to that choice. *See* RESTATEMENT § 187 cmt. e; *DeSantis*, 793 S.W.2d at 677. To that important duty we now turn.

### IV. Section 187: Contravening Material Policies

Although Texas has the most significant relationship to this dispute, we believe the result would be the same if Louisiana were awarded that distinction. Because the parties chose Texas law in their contract, that choice can be disregarded only if it contravenes a fundamental policy of Louisiana, *and* Louisiana has a materially greater interest in the determination of this indemnity issue than Texas does. *See* RESTATEMENT § 187(2)(b). For several reasons, we believe neither is the case.

#### A. Contravening Identical Policies

 We do not have to guess the public policy behind the competing indemnity statutes here, because each legislature stated it expressly:

- "The [Texas] legislature finds that an inequity is fostered[28] on certain contrac-

---

**28.** Webster defines "foster" as "to bring up with parental care; to promote the growth or development of," and "foist" (used in the Louisiana statute) as "to introduce or insert surreptitiously or without warrant; to force another to accept esp[ecially] by stealth or

deceit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 881, 897 (1993). Whatever the correct choice of law, the Louisiana Legislature has probably made the better choice of words.

tors by the indemnity provisions in certain agreements pertaining to wells for oil, gas, or water or to mines for other minerals." TEX. CIV. PRAC. & REM.CODE § 127.002(a).

- "The [Louisiana] legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals." LA.REV.STAT. ANN. § 9:2780(A) (West 1991).

We assume these policies are "fundamental" (as required by the Restatement), especially as each state has taken the unusual step of stating it explicitly. Nevertheless, because the policies are identical, we do not see how one can contravene the other.

It is true the statutory cure adopted by each state is different, although the stated policies are identical. But according to the Restatement the statutes are not in fundamental conflict merely because they would lead to different results. See RESTATEMENT § 187 cmt. g. The test is whether the chosen law contravenes a state *policy*, not the *outcome* in a particular case. See De-Santis, 793 S.W.2d at 680. A choice-of-law clause is relevant only if it *will* result in a different outcome; if that difference alone

is enough to make policies contravene, then choice-of-law clauses will *never* be enforced.[29]

■ The Restatement test requires more than this. A contractual choice of law should be disregarded only if it would "thwart or offend the public policy" of Louisiana, not if it would merely require a different result. See Monsanto Co. v. Boustany, 73 S.W.3d 225, 229 (Tex.2002). If the policies in each state are the same, different approaches do not contravene them just because one is somewhat stricter than the other. See Minnesota Mining & Mfg. Co. v. Nishika, Ltd., 953 S.W.2d 733, 736–37 (Tex.1997) (holding different commercial warranty laws did not contravene one another as both sought to balance rights of manufacturers and consumers).

Our dissenting colleagues attempt to create a fundamental conflict by overstating the extent of Louisiana's law. Louisiana law is not absolute or unqualified—non-negligent parties can enforce indemnities to their hearts' content, and settling parties may attempt to do the same.[30] The only difference between Texas and Louisiana law is how best to limit the abuse of indemnities. Arguments can be made about which state's approach is best.[31] But because both states' policies

---

29. The same is true of Justice Wittig's suggestion that policies contravene if they encourage parties to circumvent application of one state's law. *Post* at 181. The only reason for a choice-of-law clause is to avoid application of some other law. Nothing in the Restatement suggests an intent to ban such efforts entirely.

30. *See Ridings v. Danos & Curole Marine Contractors, Inc.,* 723 So.2d 979, 983 n. 2 (La.Ct. App.1998).

31. Texas law impacts the initial contracting stage—an indemnity contract must be mutual and supported by liability insurance when it is entered. TEX. CIV. PRAC. & REM.CODE

§§ 127.001–.005. Louisiana law impacts the final resolution stage—an indemnity contract becomes void only when a party is found negligent at trial. LA.REV.STAT. ANN. § 9:2780(A); *Meloy v. Conoco, Inc.,* 504 So.2d 833, 839 (La.1987). Texas law limits overreaching by making powerful negotiating parties add a provision that gives as good an indemnity as they get; Louisiana limits overreaching by striking any provision for indemnity of a party's own negligence. Texas law does not protect weaker negotiating parties from having to pay additional insurance premiums; Louisiana law does not protect weaker negotiating parties from having to pay another's defense costs when neither is negligent.

are identical, if the Texas approach thwarts Louisiana public policy, then it must also thwart its own. We decline to hold that the Texas Legislature was either mistaken or disingenuous in the approach it selected to address the stated policy.

### B. Weighing Material Interests

 Nor do we believe Louisiana has a materially greater interest than Texas in policing the bargain made by these oilfield companies. As the policy of both statutes is to regulate contractual negotiations, the interests of Texas and Oklahoma—where they actually conducted those negotiations—is simply more significant than that of Louisiana—where they did not.

For Louisiana to have a materially greater interest, there would have to be some connection between unfair bargaining (the policy of both statutes) and the location of the well (Louisiana's only contact). The only connection suggested is the protection of injured workers.[32] But the Louisiana Legislature explicitly stated its public policy in this statute, and that was not it. Moreover, this judicially-imagined policy represents a rather fundamental misunderstanding of what indemnities do. Indemnities do not *release* a company from liability to an injured plaintiff; instead, they *add* a potential source of recovery should a liable company prove insolvent. Logically, a state that aims to make work sites safer by limiting indemnities should also prohibit workers' compensation or employer's liability insurance for the

same reason, as they have the same effect. When weighing fundamental policies, we cannot unfairly tip the scales by tossing on one side fundamental policies that do not apply.

Another court has suggested the Louisiana statute may have the effect (though it is not the stated purpose) of opening up markets for Louisiana companies who will not or cannot sign indemnity contracts.[33] But it appears that some Louisiana companies regularly sign indemnity contracts—often designating non-Louisiana law that would enforce them—only to attack them successfully later as violative of Louisiana's statute.[34] By giving special weight to the law of a party's domicile, we place no barrier in the path of Louisiana companies that wish to continue this practice.

Texas, too, has several material interests that might be considered if policies beyond those explicitly stated come into play. Texas has a strong interest in enforcing its residents' contracts, even those concerning work to be done out of state. In *Maxus,* the supreme court concluded "[w]e do not read the [Texas indemnity] statute to have an extraterritorial reach, *absent some agreement between the parties."* 817 S.W.2d at 57 (emphasis added). In English usage, the statement "our rule is A, absent condition B" strongly implies "our rule is *not* A in the *presence* of condition B." To give effect to what the *Maxus* court said, Chesapeake's territorial arguments must yield to its own agreement.[35]

---

32. *Post* at 185.

33. *Amoco Prod. Co. COG-EPCO 1992 Ltd. P'ship v. Lexington Ins. Co.,* 745 So.2d 676, 680 (La.Ct.App.1999).

34. *See, e.g., Verdine v. Ensco Offshore Co.,* 255 F.3d 246, 254 (5th Cir.2001); *Roberts,* 235 F.3d at 943–44; *Matte v. Zapata Offshore Co.,* 784 F.2d 628, 631 (5th Cir.1986); *Meloy v.*

*Conoco, Inc.,* 504 So.2d 833, 839 (La.1987); *Lexington Ins. Co.,* 745 So.2d at 677.

35. Given our analysis of these policies, we do not mean to suggest that choice of law agreements in indemnity contracts are *per se* enforceable. But the "absent some agreement" condition in *Maxus* renders overbroad Justice Frost's statement that the supreme court in *Maxus* "adopted a territorial approach to anti-indemnity statutes." *Post* at 199.

Finally, by requiring indemnities that are mutual and supported by adequate insurance, Texas law increases the probability that injured parties may recover not just a paper judgment, but one that is collectible. Fritz and Alms were not the first Texas residents to be injured while working on a drilling site in Louisiana, and probably will not be the last. A plaintiff with a strong negligence case against a financially weak contractor is clearly better off if that contractor is backed up by an indemnitor and its insurance.

### V. Conclusion

Little need be said about the importance of oilfield services to this state, its economy, and its people. Texas indemnity law allows companies to substitute insurance in place of uncertain liability, thus limiting their costs and making them more predictable. *Getty Oil Co. v. Ins. Co. of N. America*, 845 S.W.2d 794, 804 (Tex.1992). Disregarding indemnity clauses (and the insurance agreements behind them) by applying another state's law does just the opposite. In applying Texas law to the two cases before us, we recognize the state's interest that indemnity clauses meet certain requirements, and are enforced when they do. Because these sophisticated parties drafted a contract to meet Texas law, and deemed it to apply, we believe they should have what they bargained for.

For these reasons, we affirm the summary judgment for Nabors in Cause Number 14–00–00173–CV (*Alms*), and we reverse and remand the judgment against Nabors in Cause Number 14–00–00580–CV (*Fritz*).

Justices ANDERSON, FOWLER, SEYMORE, GUZMAN, and Senior Justice McCLOUD joined the majority opinion.

Senior Justice WITTIG filed a dissenting opinion in which Justices YATES, HUDSON, and FROST joined.

Justice FROST filed a dissenting opinion in which Justice HUDSON and Senior Justice WITTIG joined.*

Justice EDELMAN filed a dissenting opinion.

DON WITTIG, Senior Justice (Assigned), dissenting.

The narrow and sole disagreement among the members of our court is whether section 187(2)(b) of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) calls for the application of Louisiana law.[1] We

---

* Senior Justices Don Wittig and Austin McCloud sitting by assignment.

1. All members of this court agree: (1) Restatement of Conflicts section 187 determines whether the parties' contractual choice of Texas law is permissible. *See Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex.1991); (2) No indemnity is payable if Louisiana law governs these two Drilling Contracts. *See* LA.REV STAT. ANN. § 9:2780(A) (West Supp.2001) (declaring null and void and against public policy of the state of Louisiana any indemnity provision that protects an indemnitee from the consequences of its own negligence or strict liability); (3) Indemnity is proper if application of Texas law is also proper. *See* TEX CIV. PRAC. & REM.CODE

ANN. §§ 127.003, 127.005 (Vernon 1997) (allowing indemnity agreements if indemnity obligation supported by insurance); (4) The indemnity clauses in the Drilling Contracts at issue meet fair notice requirements required under Texas law. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex.1993) (holding indemnity void because it was not conspicuous); (5) The parties could not have resolved the issue of indemnification by explicit agreement. *See* RESTATEMENT § 187 cmts. c, d (capacity, formality, substantial validity are some examples of items not resolvable by agreement); and (6) The State of Texas does not lack a substantial relationship to the parties or the transactions at issue. *Id.* at § 187(2)(a) (requiring application of law cho-

believe Louisiana law, not the law of a forum selected by the litigants, should regulate indemnity obligations arising from accidents occurring wholly within Louisiana and arising solely out of the operation of Louisiana wells. Because the majority opinion reads discriminatory intent into both Texas and Louisiana's anti-indemnity statutes, conflicts with the supreme court's controlling decision in *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50 (Tex.1991), disregards both Louisiana's greater interest in regulating its own dangerous activities and its disparate public policy, and encourages forum shopping, we respectfully dissent.

Restatement section 187(2)(b) mandates application of the law chosen by the parties unless:

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

*See* § 187(2)(b). We respectfully disagree with the majority opinion's resolution of every element in section 187(2)(b). We address each in turn.

## I. Would application of Texas law be contrary to Louisiana policy?

The majority opinion holds application of the Texas oilfield anti-indemnity statute cannot be contrary to the fundamental policy served by the Louisiana oilfield anti-indemnity statute because the anti-indem-

nity policies of Texas and Louisiana are the same. According to the majority opinion, the difference between the laws of the two States is one of "approach," not "policy." By this synthetic reasoning, the majority opinion reframes the Restatement inquiry into one for which it has an appropriate answer.

The Restatement instructs us that two states' laws do not conflict merely because they lead to different results in particular cases. *See* RESTATEMENT § 187 cmt. g. The Restatement does not provide, however, that different results are necessarily incompatible with conflict. In the context of non-competition agreements, the Texas Supreme Court determined a conflict would exist because:

> An employee of one out-of-state employer might take a competing job and escape enforcement of a covenant not to compete because of the law of another state, while a neighbor suffered enforcement of an identical covenant because of the law of a third state. The resulting disruption of orderly employer-employee relations, as well as competition in the marketplace, would be unacceptable. Employers would be encouraged to attempt to invoke the most favorable state law available to govern their relationship with their employees in Texas or other states.

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 680 (Tex.1990). By analogy, if the application of Texas law would encourage companies to circumvent Louisiana's anti-indemnity act by either incorporating or executing contracts outside of Louisiana, then a policy-level conflict is presented.[2] *See Tucker v. R.A. Hanson Co.*, 956 F.2d

sen by parties unless law chosen does not bear a substantial relation to transaction or parties).

**2.** The ability to prospectively avoid Louisiana law is reduced by the lack of certainty regarding the venue chosen for the underlying per-

sonal injury suit. This latter uncertainty, however, is itself a creature of the majority opinion. If the indemnity obligation is not split away from the contract as a "particular issue," Texas courts, following *Maxus,* would nearly always apply Louisiana law and there-

215, 219 (10th Cir.1992) (finding policy conflict because companies working in New Mexico could sign contracts in other states and avoid New Mexico's anti-indemnity statute entirely).

Louisiana's anti-indemnity statute is designed, in part, to protect workers in Louisiana. *See* L.A.REV.STAT. ANN. § 9:2780(A); *Fontenot v. Chevron U.S.A., Inc.,* 676 So.2d 557, 563 (La.1996) ("It is also clear ... that the [Louisiana] Anti–Indemnity Act was designed not only to protect oilfield contractors but also their employees."). *See also Tucker,* 956 F.2d at 219 (holding New Mexico anti-indemnity statute protects injured workers). Messrs. Fritz and Alms worked and were injured in Louisiana. The application of Texas law would deny them Louisiana's worker protections and unquestionably encourage employers to invoke the more favorable law of Texas. *Compare* TEX. CIV. PRAC. & REM. CODE ANN. §§ 127.003, 127.005 (Vernon 1997) (allowing indemnity if backed by insurance) *with* LA.REV.STAT. ANN. § 9:2780(A) (unqualified denial of indemnity i.e. this type of indemnity is *void* ). To hold otherwise, by any logic, is to rewrite Louisiana law and disregard the statutory interpretation of the Louisiana Supreme Court.

## II. Does Louisiana have a materially greater interest in the determination of the law applicable to indemnity? Should the issue of indemnity be separated from the Drilling Contract as a whole?

The majority opinion strives to strengthen its argument that Texas has a greater interest in these indemnity disputes by separating the indemnity obligations from the parties' other (far more substantial) obligations under the Drilling Contracts. Although the Texas Supreme Court has declined to determine whether oilfield indemnities are "particular issues" to be addressed separately under Restatement sections 187 and 188, we do know that "most issues involving a contract will usually be governed by a single law." *Maxus,* 817 S.W.2d at 54 (concerning oilfield indemnity authored by the same organization that authored the contracts at issue here). Only occasionally will separation and identification of the particular issue provide a more helpful basis for choice-of-law questions. *Id.* "As a rule," the fact that nearly all the services contemplated by the parties were performable in a particular state "is conclusive in determining what state's law is to apply." *Id.* (citing *DeSantis,* 793 S.W.2d at 679). To parse and mince one issue, seeks annihilation of the dominate purpose and objective of respecting Louisiana's right to hold the regulatory reigns over its own industries and defeats Louisiana's overriding policy of voiding such indemnification.

We think oilfield services contracts should not be fractured in the manner suggested by the majority because to do so divides the law applicable to indemnity and the underlying insuring agreement.[3] The insurance contract is subject to the "law of the state which the parties understood was to be the principal location of the insured risk." *See* RESTATEMENT § 193; *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.,* 64 F.3d 1112, 1115 (7th Cir.1995). The principal location of the risks insured in these disputes is the location of the well. What is to prohibit today's losing insurer of Nabors or Chesapeake from hustling across the Sabine and invoking a Louisiana court's declaration there is no coverage?

---

by prevent the wholesale avoidance of Louisiana's worker protections.

3. As we discuss below in part III of our opinion, examining indemnities in a vacuum also undermines proper analysis under Restatement sections 6 and 188(2).

Without coverage, even Texas law prohibits oil field indemnification. The logical consequence of mutual disrespect is open conflict.[4]

We would follow *Maxus* and decline to sever indemnity from the drilling activities forming the greater part of the parties' contract for drilling services in Louisiana. The well services were performed in Louisiana. *Maxus,* 817 S.W.2d at 54. The accidents out of which these indemnity disputes arose occurred in Louisiana. The insurance obligations which provide the money to satisfy these indemnity claims are governed by Louisiana law. *Id.* And a Louisiana or other court's determination of no coverage for an indemnitor would defeat Texas indemnification.

Louisiana has a greater interest in regulating hazardous industries within its borders, a greater interest in the safety and welfare of its own workers, a greater interest in insurance within its borders, and a greater interest in relegation of risk *intra* state. For multiple reasons, we would hold Louisiana has a materially greater interest in regulating these indemnity obligations.

## III. Would, under Restatement section 188, Louisiana law have applied in the absence of a choice by the parties?

### A. Is contractual indemnity a "particular issue" under section 188(1)?

The Restatement rations the use of the "particular issue." A brief exposition of the structure of the Restatement itself is necessary to understand the novelty of the majority opinion in holding that contractual indemnity is a "particular issue." The general rule for choice of law in tort matters is found in Restatement section 145. For contract matters, the general rules are found at sections 187 and 188. A variety of specific rules for "particular torts," "particular contracts," and "particular issues" in contract follow each respective general rule. Each "particular issue" in contract is set forth in sections 198–207, and once denominated as such, refers back to the general rules. In other words, the "particular issue" language in the Restatement contemplates certain, enumerated issues and no others. Problematically, the "particular issue" of which the majority is so fond, is not to be found in the Restatement.

In order to consider only the place of performance of the indemnities, the majority opinion relies upon *Hughes Wood Products, Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex.2000). *Hughes* involved a multi-jurisdictional worker's compensation dispute, a subject covered by specific rules at sections 181–185 of the Restatement. The *Hughes* court reversed the court of appeals because it resolved the parties' dispute with reference only to the general provision in Restatement section 145.[5] 18 S.W.3d at 205–06. Worker's compensation, like every authority cited in *Hughes,* is explicitly identified as a "particular is-

---

4. One federal court, in related litigation, agrees with our reasoning. *See Old Republic Ins. v. Chesapeake Operating, Inc.,* No. 991270, 2000 WL 33399807 (W.D.La. Nov.1, 2000) (not designated for publication). While judicial estoppel does not apply, comity would suggest our ruling be consistent, unless against a greater public policy interest of Texas. We do not believe two corporations arguing over attorney's fees is such a policy interest.

5. The court held:

> The court of appeals erred in failing to consider section 184's application to the exclusive—remedy issue. The Court has often applied more specific sections of the Restatement to address particular choice of law issues. *See, e.g., Purcell v. Bellinger,* 940 S.W.2d 599, 601 (Tex.1997) (applying section 93 to evaluate the res judicata effect of an out-of-state judgment); *Ford Motor*

sue" in the Restatement. By contrast, the Restatement contains no special provision for contractual indemnity. Although the majority opinion's ultimate conclusion that contractual indemnity is a "particular issue" within the meaning of Restatement section 188 may or may not be erroneous, neither *Hughes* nor *Maxus*, a contractual indemnity dispute, offer support. Because *stare decisis* does not support fracturing this contract, we would decline to do so.

### B. Application of the principles in Restatement section 6 and the contacts in section 188(2)

As required by section 188(1), the majority opinion applies section 6 and the contacts named in section 188(2) to determine whether Louisiana's relationship to the parties and the transaction is more significant than Texas's.[6] Again, the majority's analysis achieves a result which is generally at odds with the law of conflicts. The principles in sections 6 and 188(2) overlap and should be analyzed together. *See* Restatement § 188(2). The five contacts in section 188(2) represent, in contract actions, four underlying principles. These principles are:

(A) promotion of mutually beneficial relationships among States;

(B) recognition of state interests;

---

*Co. v. Leggat*, 904 S.W.2d 643, 647 (Tex. 1995) (applying section 139 to determine whether another state's attorney-client privilege should apply in a Texas court case); *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53–54 (Tex.1991) (invoking section 196 to determine the law governing contracts for personal services); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677–78 (Tex.1990) (adopting section 187 for evaluating the enforceability of contractual choice of law clauses).
*Hughes*, 18 S.W.3d at 206, 206 fn. 2.

**6.** Section 188(2) provides:

(C) protection of parties' expectations through certain and predictable results; and

(D) ease in the determination and application of the law to be applied.

*See* Restatement § 188 cmt. b. The principles recognized in section 6 are:

(A) the needs of the interstate and international systems;

(B) the relevant policies of the forum;

(C) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(D) the protection of justified expectations;

(E) the basic policies underlying the particular field of law;

(F) certainty, predictability, and uniformity of result; and

(G) ease in the determination and application of the law to be applied.

*Id.* § 6. The majority opinion's application of these principles can be summarized as follows:

(1) anti-indemnity statutes are meant to protect companies domiciled in the States where the statute is passed;

(2) because neither party is domiciled in Louisiana, neither party could have a justifiable expectation in the applica-

---

In the absence of an effective choice of law by the parties (see section 187), the contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:
(A) the place of contracting;
(B) the place of negotiation of the contract;
(C) the place of performance;
(D) the location of the subject matter of the contract; and
(E) the domicile, residence, nationality, place of incorporation and place of business of the parties.

tion of the Louisiana anti-indemnity statute;

(3) because at least one party is domiciled in Texas, the Texas indemnity statute should be applied; and

(4) finality, certainty, and uniformity are best met by applying the law of a state chosen by the parties if at least one of them is domiciled there.

## C. Our Application of Section 188(2) and Section 6

We apply the principles in section 6 and the contacts in section 188(2) differently than the majority. First, reliance on the *place of performance of the indemnity* is improper because it undermines a chief aim of Restatement section 187, which is to recognize and balance competing laws. Section 187 identifies circumstances where the parties' choice of law should be overridden by state regulation.[7] By separating the issue of indemnity from the drilling-services contract as a whole, the majority opinion is able to exalt the place of performance of the indemnity as the chief determinant of choice of law under section 188. Of course, the place of performance of indemnity is left to the whim of the litigants. Because the law of a non-forum state cannot be applied under section 187 unless it would have been applied under section 188, section 187 never alters the litigants' choice of law for oil-field indemnities under the majority's reasoning. Section 187 is rendered unacceptably impotent by this rationale. If indemnity was the only "performance" considered, then we might agree with the majority that the only "place of performance" to be considered under section 188(2) is in Texas. But

we do not agree that removing all "performances" with links to Louisiana prior to conducting analysis under section 188(2) is a sound approach to conflicts of laws. *See Maxus*, 817 S.W.2d at 54 (declining to determine whether focus on place of performance of indemnity improper under similar facts).

Second, as we discuss above, we observe and articulate the different *policies* underlying the Texas and Louisiana anti-indemnity statutes. The majority's conclusions about Louisiana policy ignore the Louisiana Supreme Court's explicit assertion that the Louisiana statute is intended to protect injured workers as well as their employers. In any event, we believe the majority's emphasis on the domicile of the parties is unjustifiably discriminatory and reject the notion that state and federal courts generally apply the law of the parties' domiciles when considering conflicting indemnity laws.

Third, we do not agree that because the parties' contract specified Texas law, neither should have *reasonably expected* the protection of Louisiana's indemnity statute. *See id.* We think all persons physically present in the state of Louisiana can reasonably expect application of Louisiana law, especially law meant to override private bargains based upon firmly held public policy. *See Maxus*, 817 S.W.2d at 53–54 (holding it can be assumed that parties expect application of the law of state where major portion of contract performance occurs). *See also DeSantis*, 793 S.W.2d at 679 (holding Texas had materially greater interest than Florida in dispute over non-competition agreement because

---

**7.** It is for this reason any reference to the sophistication and economic size of the contracting parties is inapposite. Whether a company is large or small is immaterial since, under section 187, if the public policy is strong enough, *all* private persons are prohibited from choosing law. *Cf. DeSantis*, 793 S.W.2d at 678–80 (no mention of parties' sophistication or size in analysis).

employee was a resident of and worked in Texas).[8]

Fourth, we cannot agree that *determination and application of law* is eased in these cases by applying to the indemnity issue the law of the state where the injured party brought suit. The majority must concede that choice of law under its reasoning is based in large part upon the domicile of the parties. Domicile and venue are patently ephemeral. And what of the fact that some companies may have multiple domiciles? Under the majority approach, there will be new litigation to determine the domicile of the parties.

Fifth, we believe the *needs of the interstate system* are strongly implicated in these indemnity disputes. *Compare Maxus,* 817 S.W.2d at 54 ("The state where the services are to be rendered will also have a natural interest in them.") *with* RESTATEMENT § 188 cmt. c. (state of party's domicile has interest in application of its own rule). As the majority notes, our nation's courts have been kept busy in recent years determining the validity of oilfield indemnities. It is evident there is a need for a uniform analysis that will aid companies in reliably choosing among states' conflicting laws.[9]

Sixth, we believe the majority's reasoning is more likely to diminish, rather than create, *certainty, predictability and uniformity.* If the majority is correct that the true place of performance is where the injured party files suit, there will be no

certainty until that suit is filed.[10] Here, under the majority opinion, a simple assignment of either party's contract rights could have altered the choice of law of indemnity. In fact, there was an assignment by one Texas company to another in these cases. Had the assignments been to a company in a third state, would the law of that state apply? Under the analysis by the majority opinion, assignment or merger of interests could give us yet another result, from the same Louisiana accident. Given the rapidly changing corporate climate in the oil business, under the majority's reasoning, any major corporate acquisition involving companies domiciled in different states might alter the choice of law for indemnity arising out of hundreds of accidents.[11] This result is entirely unpredictable. *See Maxus,* 817 S.W.2d at 54 (holding that application of law of state where physical performance takes place will be readily ascertainable and thereby create certainty.)

Seventh, it is reasonably clear that the majority opinion offers plaintiffs (and defendants) *carte blanche* to *forum shop.* Attorneys may add parties, move their clients, or await corporate mergers to get the indemnification statute they prefer. Finally, as we discuss below, we are comfortable the supreme court has already answered the section 6 inquiry.[12]

For all these reasons, we would hold Louisiana has a more significant relation-

---

8. The expectation of Louisiana law to the exclusion of Texas law would not be reasonable either.

9. One must wonder, were we addressing an Alaskan salmon cannery accident, would Texas cast such extra territorial reach.

10. There will be no certainty even after the suit is filed if insurance coverage is contested.

11. In mid-March, 2002, for example, Nabors bought Enserco Energy Services Co., Inc., a

Canadian enterprise owning 193 service rigs and 30 drilling rigs. Indemnity obligations for all suits arising out of accidents at Enserco wells would be potentially subject to the Texas oilfield anti-indemnity act and Texas enforcement regardless of the accident situs.

12. *Maxus* determined which state's law applied absent choice by the parties, the same inquiry required under section 6.

ship to the parties and the transaction than Texas.

### D. *Maxus*—Has the supreme court already decided this issue?

We believe the supreme court has already held that geography, not domicile, should be emphasized in determining the jurisdictional boundary of the Texas anti-indemnity statute. In *Maxus*, the court refused to apply Texas law to an oil-field indemnity dispute *even though* indemnity was sought in Texas. 817 S.W.2d at 54. The court specifically stated that the outcome was dictated by the location of the oil well, writing:

> One can argue that the Texas Legislature's purpose in enacting [the anti-indemnity statute] is to protect Texas contractors who work on mineral wells and mines wherever they may be situated, but we think it more plausible that it had the more limited objective of protecting contractors who drill wells in Texas. We do not read the statute to have an extraterritorial reach, absent some agreement between the parties.

*Id.* Based on the foregoing, we cannot agree with the majority's reading of *Maxus* that a different rule applies merely because the contractor seeking to enforce the indemnity is a Texas domiciliary.[13]

The majority also would distinguish *Maxus* from the cases at bar based on the final clause in the excerpt above relating to agreement of the parties. Here, unlike in *Maxus*, the parties chose which state's law to apply. However, Restatement section 187(2)(b) requires an examination of the policies underlying the anti-indemnity statutes, assuming no choice of law had been made. *See* RESTATEMENT § 187(2)(b).

Thus, the policy identified in *Maxus* supporting anti-indemnity is relevant; whether the parties actually chose the law of a particular state is not. The error in the majority's consideration of the parties' choice is easily seen upon recollection of the premise of conflicts analysis: If the fact that parties chose law was relevant in determining whether their choice should be overruled by public policy, our review would be perfunctory at best.

### Conclusion

In *Maxus*, the Texas Supreme Court joined several other courts in recognizing the location of the performance of the majority of services under a contract determines the "place of performance" for conflicts purposes. *See, e.g., Palmer G. Lewis Co. v. ARCO Chem. Co.*, 904 P.2d 1221, 1227 (Alaska 1995); *Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 218–19 (10th Cir. 1992); *Donaldson v. Fluor Eng'rs, Inc.*, 169 Ill.App.3d 759, 120 Ill.Dec. 202, 523 N.E.2d 1113, 1116 (1998). The stability provided by the geography-based analysis identified in *Maxus* enables all parties, whether based in Texas or elsewhere, to easily identify and allocate risks associated with oilfield indemnity obligations.

This entire court believes anti-indemnity statutes cannot be avoided by private bargain. Only the reach of the anti-indemnity statutes is disputed. The question is one of national importance. The geographically restrictive reasoning stated in *Maxus* best serves the citizens of Texas by reliably respecting the rights of the citizens of Louisiana and of our United States. By contrast, policy determination and conflicts resolution based on domicile or venue are inherently unstable and openly discriminate against our neighbors.[14] We respectfully dissent.

---

**13.** The majority incorrectly interprets the "extraterritorial" reference in *Maxus* to refer to the domicile of the litigants, rather than the location of the oil well.

**14.** Nabors's argument is further undermined

KEM THOMPSON FROST, Justice, dissenting.

The question before the court is a sensitive one because it compels us to choose between the law our own legislature enacted for operations in Texas oilfields and the law of a neighboring state whose legislature chose a different path for oilfield operations within its territorial boundaries. The question is a significant one not only because it tests the measure of our deference to another state's right to make the rules within its borders, but also because it impacts some of the most valued qualities in our own civil justice system—freedom of contract, fulfillment of justified contract expectations, and predictability in the enforcement of contractual provisions.

Although, ideally, conflict-of-laws rules should be simple and easy to apply [1], application of the Restatement test to the choice-of-law provision in these consolidated cases requires a multi-tiered analysis and the balancing of many factors. The members of this court have labored earnestly to resolve this challenging and multifaceted issue, giving careful scrutiny to the arguments of the parties and the logic of the learned trial judges who trod this same ground in reaching two different conclusions. The close vote and spirited discussion are testament not only to the complexity of the task but also to the strength of the arguments on both sides of this important issue.

The result the court reaches is not unfair or unreasonable, but the path the majority takes to get there strays too far from the course the Texas Supreme Court has charted for resolution of conflict-of-laws issues. Some of the majority's policy arguments are quite compelling, but its

legal analysis is flawed and out of step with most other jurisdictions that have considered the issue. More importantly, the road the court takes today compromises the principles our high court has adopted for deciding conflict-of-laws issues. The road not taken is the one that would further them.

For Louisiana law to apply to the indemnity provisions in this consolidated appeal, all three of the following must be true: (1) Louisiana law would apply to the facts of this case under section 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, ignoring the provision of the drilling contract choosing Texas law; (2) the application of Texas law would be contrary to a fundamental policy of Louisiana; and (3) Louisiana has a materially greater interest than Texas in determining whether these indemnity provisions are enforceable. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex.1990); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b) (1971). As explained in Justice Wittig's dissent and amplified below, each of these statements is true; therefore, Louisiana law should apply. The court errs in holding that Texas law applies.

### Louisiana law would apply under section 188.

The majority erroneously concludes that Texas law would apply under section 188 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS in the absence of the choice-of-law provision. In performing the analysis under section 188, the court must determine "the place of performance." *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (1971). The majority concludes

---

1. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(g) & cmt. (j).

by recent reincorporation in Bermuda. *See* Nelson Antosh, *Five firms answer call of islands*, HOUSTON CHRONICLE, April 21, 2002, at A1, A16.

that the place of performance is Texas because that is where Danny Alms and Dennis Fritz filed suit. The majority opinion cites no authority for this proposition. Although this appears to be an issue of first impression under Texas law, the majority rule from jurisdictions that have addressed the issue is that the state in which the indemnitee is sued is *not* the place of performance under section 188(2)(c). *See McCall v. Columbia Gas Dev. Corp.*, 635 F.Supp. 49, 52 (W.D.La.1986) (holding that place of performance under § 188 for an indemnity provision is where services contract was performed); *Hebert v. Kerr–McGee Corp.*, 618 F.Supp. 767, 772–73 (W.D.La.1985) (holding that Texas law applied and that Texas was place of performance because work order was wholly performed on Outer Continental Shelf off coast of Texas—a jurisdiction governed by Texas law—even though plaintiff sued indemnitee in Louisiana); *Palmer G. Lewis Co., Inc. v. ARCO Chem. Co.*, 904 P.2d 1221, 1223–27 (Alaska 1995); (holding that place of performance under § 188(2)(c) is state in which contract containing the indemnity provision was performed rather than state where indemnitee is sued); *Dillard v. Shaughnessy, Fickel and Scott Architects, Inc.*, 943 S.W.2d 711, 714–17 (Mo. Ct.App.1997) (same); *see also Reding v. Texaco, Inc.*, 598 F.2d 513, 515–18 (9th Cir.1979) (holding that contract was performed in Wyoming and that Wyoming anti-indemnity statute applied where well was drilled in Wyoming, even though (1) parties were from Texas and New York; (2) parties executed drilling contract in Colorado and Texas; and (3) indemnitee was sued in California); *but see Grossman v. Aristech Chem. Corp.*, 882 F.Supp. 110, 113 (W.D.Mich.1994) (stating that place of performance of indemnity is the state in which the indemnitee was sued); *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 448 Mich. 113, 528 N.W.2d 698, 704–05 (1995)

(indicating that place of performance of an indemnity may have been the state in which the indemnitee was sued). Though the majority does not see why Louisiana "should set the rules for [this] fight," other courts addressing this issue have found that the state where the services were performed had the most significant relationship to the transaction and the parties, as to the enforceability of an indemnity provision covering litigation in a different state. *See Hebert*, 618 F.Supp. at 772–73; *Dillard*, 943 S.W.2d at 714–17; *see also Reding*, 598 F.2d at 515–18.

Furthermore, the United States Court of Appeals for the Fifth Circuit has applied Texas conflict-of-laws rules in a way that is contrary to the majority's analysis. In *Gorsalitz v. Olin Mathieson Chem. Corp.*, the contract containing the indemnity was executed in Texas; however, the services under the contract were performed in Louisiana. 429 F.2d 1033, 1048 (5th Cir.1970). The Fifth Circuit held that Louisiana law applied to the indemnity provision because Louisiana was the place of performance, even though the personal-injury plaintiff sued the indemnitee in Texas. *See Gorsalitz*, 429 F.2d at 1035–36, 1048. The *Gorsalitz* court ruled that, when conducting a conflict-of-laws analysis as to an indemnity provision, the place of performance is where the service contract containing the indemnity was performed, not where the indemnitee was sued. *See Gorsalitz*, 429 F.2d at 1035–36, 1048. The *Gorsalitz* case was decided before Texas adopted the RESTATEMENT (SECOND) OF CONFLICT OF LAWS. Nonetheless, in *Maxus Exploration Co. v. Moran Bros., Inc.*, the Texas Supreme Court cited *Gorsalitz* as good law. 817 S.W.2d 50, 53 (Tex.1991).

Notwithstanding the Texas Supreme Court's reliance on *Gorsalitz* in *Maxus*, the majority finds the *Roberts* case more persuasive. *Compare Roberts v. Energy*

*Dev. Corp.*, 235 F.3d 935, 938–43 (5th Cir. 2000), *with Gorsalitz*, 429 F.2d at 1035–36, 1048. The *Roberts* case seems to indicate that the place of performance was where the services under the contract were performed, rather than where the indemnitee was sued. *See Roberts*, 235 F.3d at 941–43. After stating that it must consider several factors, including the place of performance, the *Roberts* court stressed several times that the accident occurred in Louisiana and that the work order at issue pertained to work to be performed exclusively in Louisiana. *See id.* The *Roberts* court never mentioned the fact that the personal-injury plaintiff happened to have filed suit in Louisiana. *See id.* Therefore, *Roberts* does not support the majority opinion on this issue.[2] *See id.* More importantly, inasmuch as our high court relied on *Gorsalitz* in *Maxus*, it is *Gorsalitz's* holding—*that the place of performance for an indemnity is not the place where the indemnitee is sued*—that should merit this court's attention. The majority, however, goes in the opposite direction.

Today the court creates a rule of law new to Texas—that the place of performance for indemnity issues is the place where the indemnitee is sued. The court's new rule is contrary to the Texas Supreme Court's emphasis on the place of performance in deciding conflict-of-laws issues. *See Maxus Exploration Co.*, 817 S.W.2d at 53–57. Though the *Maxus* court chose not to expressly decide whether the place of performance as to an indemnity issue is the place where the indemnitee is sued, it analyzed the indemnity provision of a drilling contract under section 196 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, which governs contracts for personal services. *See Maxus Exploration Co.*, 817 S.W.2d at 53–57; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 196 (1971); *see also Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 206 n. 2 (Tex.2000) (describing *Maxus* as an opinion "invoking section 196 to determine the law governing contracts for personal services"). The *Maxus* court stated that "[i]n the case of a contract for the rendition of services, section 196 accords the place of performance *paramount importance.*" *Maxus Exploration Co.*, 817 S.W.2d at 53 (emphasis added). The majority states that the place of performance is the place where attorneys performed legal services defending Nabors, the indemnitee. Therefore, under today's new rule, the place where the indemnitee is sued becomes of "paramount importance" in the conflict-of-laws analysis. *See id.* Consequently, that which is unknown at the time of contracting— *where a future lawsuit might one day be filed*—is accorded superior weight and influence in the majority's analysis. Under this approach, the law applicable to oilfield indemnities, as well as the extent to which these indemnities are enforceable, will vary depending on the jurisdiction in

---

**2.** The *Roberts* court refused to enforce the parties' choice-of-law provision and held that the Louisiana anti-indemnity statute applied. *See id.* at 938–44. This was a correct holding. Although there are comments in the *Roberts* case that support the majority's emphasis on the citizenship of the contracting parties, these comments are not necessary to the holding in that case. *See Roberts*, 235 F.3d at 942–43. The *Roberts* court distinguished the Fifth Circuit's prior affirmance, without opinion, of an unpublished decision in *American Ins. v. Apache Corp. See id.* at 943; *American Ins. v. Apache Corp.*, 95 F.3d 1149 (5th Cir. 1996). Though *Roberts* indicates that *American Ins.* involved two Texas contractors, it is difficult to evaluate *American Ins.* and the *Roberts* court's discussion of it, because there is no opinion from the Fifth Circuit in *American Ins.* and because the district court's opinion is unpublished and not available on electronic databases. *See American Ins.*, 95 F.3d at 1149. To the extent that *Roberts* supports an analysis based on the citizenship of the contracting parties, it is unpersuasive for the reasons explained below.

which the indemnitee is sued. The place of performance for an indemnity will always be a mystery until suit is filed and then that place—*wherever it may be*—will become of "paramount importance" in determining which state's law applies. Given that happenstance will govern the outcome, it is difficult to characterize this means of determining place of performance as anything but "purely fortuitous." *See ante,* op. at p. 172, n. 16 (majority opinion). Moreover, this methodology contradicts the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, which indicates that the place of performance points to no particular state if, at the time of contracting, the place of performance is unknown or uncertain.[3] *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. (e), at 580; *accord Hebert,* 618 F.Supp. at 772.

The majority opinion also seems to imply that the fourth factor—the location of the subject matter of the contract—does not apply in this case because this factor is important only for contracts dealing with a specific physical thing, such as land or a chattel, or with protection against a localized risk. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. (e), at 580–81; *ante,* op. at p. 170, n. 13. The majority also states that, even if the location of the contract's subject matter is an important factor, this factor points to Texas under the same analysis the majority uses for the place-of-performance factor—because the personal-injury plaintiff sued the indemnitee in Texas. *See ante,* op. at p. 170, n. 13. Although section 188 states that factors are to be evaluated according to their rela-

tive importance with respect to the particular issue, the fourth factor is still the location of the *contract's* subject matter—not the location of the subject matter of the particular issue. The only contract involved in this case is the drilling contract under which the Burns 7–1(Re) well was drilled in Louisiana.[4] This contract deals with a specific physical thing, such as land or a chattel—the Burns 7–1(Re) well in Louisiana. Therefore, the location of this well—in Louisiana—must be significant for the court's conflict-of-laws analysis. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. (e), at 580–81. The majority misses the mark in concluding that the location of the subject matter of this drilling contract is Texas. The subject matter of the drilling contract did not change because an indemnitee was sued in Texas.

If the place of performance and location of the contract's subject matter were determined based on where the indemnitee is sued, as the majority concludes, then these factors would point to no particular state because, at the time of contracting, the parties had no way of knowing where any future suit might be brought against any indemnitee under the contract. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. (e), at 580; *accord Hebert,* 618 F.Supp. at 772. Nevertheless, the majority concludes that Texas is both the place of performance and the location of the contract's subject matter. This conclusion is contrary to the Restatement analysis the Texas Supreme Court has adopted.

**3.** According to the majority, the *Maxus* court held that the "ease in determination and application of the law to be applied" (the seventh principle in § 6 of the Restatement) points to applying the law of the state where the injured party brought suit. *See ante,* op. at p. 177–78. The *Maxus* court did not so hold; rather it stated that "Kansas law is

easily determined and applied." *Maxus Exploration Co.,* 817 S.W.2d at 57.

**4.** As noted in the majority opinion, both lawsuits consolidated into this appeal involved the same International Association of Drilling Contractors drilling contract.

Additionally, the majority's methodology for determining which state's law applies contravenes the need for certainty, predictability, and uniformity of result. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(f) (1971). To change the conflict-of-laws analysis, and quite possibly the law applicable to the contract, based on where the plaintiff happens to file suit against the indemnitee is random and arbitrary. Moreover, it adds uncertainty, unpredictability, and variety of result to an area of the law already burdened with these unwelcome qualities. *See Dillard,* 943 S.W.2d at 717. As Justice Edelman points out in his dissenting opinion, there is a compelling need for certainty, predictability, and uniformity of result in the conflict-of-laws area. Though parties may find the laws of states in which they conduct oilfield operations problematic or undesirable, without the majority's new rule, at least they would have the security of knowing the law by which they will be bound if and when suit is filed. With that knowledge, there is some measure of predictability; without it, there is none.

Although certainty, predictability, and uniformity of result do not determine the place of performance, the lack of these qualities undermines the principles the Restatement test is designed to further. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6. Recognizing that predictability is a valid consideration in the analysis, the majority asserts that its new rule fosters predictability by enforcing the law chosen by the parties. Unquestionably, as to parties with choice-of-law provisions in their contracts, the rule that would provide the most uniformity, certainty, and predictability would be a rule that always enforced the parties' choice of law; however, for policy reasons, the Restatement and the Texas Supreme Court have not chosen this rule. *See DeSantis,* 793 S.W.2d at 677–78; RESTATEMENT (SECOND) OF CONFLICT OF LAWS

§ 187. Under the Restatement rule adopted by the Texas Supreme Court, we are to analyze the three factors contained in section 187(2)(b) of the Restatement, one of which is the determination of the law that would apply under section 188 if there were no choice of law by the parties. Instead of doing this, the majority is concerned with giving "judicial respect" to the parties' choice of law and thwarting any attempt to "undo the result" of this bargain. Though it is quite tempting to rely on the parties' contractual choice of law in analyzing this thorny issue, it is not appropriate to do so as part of a section 188 analysis. *See DeSantis,* 793 S.W.2d at 677–78; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187. By giving "judicial respect" to the parties' choice-of-law provision, the majority considers the very thing the Texas Supreme Court has said we should ignore. *See DeSantis,* 793 S.W.2d at 677–78; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187.

Even if it were proper to consider the parties' choice of Texas law and their expectation that Texas law would apply based on the insurance and indemnity provisions of the drilling contract, the result the majority reaches would not necessarily follow. Significantly, the Restatement refers to "protection of *justified* expectations." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(d) (emphasis added). As a general rule, contracting parties should expect that the provisions of their contracts will be binding on them and that courts will enforce the bargains they have struck. However, that is not always the case. For example, parties who enter into contracts that contain provisions which are illegal or against public policy have no legitimate expectations that their contracts will be enforced because courts declare such contracts void. *See e.g., In re Kasschau,* 11 S.W.3d 305, 312–14 (Tex. App.-Houston

[14th Dist.] 1999, orig. proceeding) (concluding the trial court was justified in finding settlement agreement void where agreement included provision illegally requiring parties to destroy evidence in a potential criminal proceeding). Consequently, in those cases, the parties' contract hardly reflects justified expectations for it is not logical or reasonable that a party should expect a court to enforce a contract that the law declares void. In such cases, it is more accurate to say that the contract reflects the parties' agreement, hope, and desire but not necessarily their justified expectations.

Here, the parties apparently were aware of the enforceability issue regarding the oilfield indemnities. They apparently recognized that they were drilling for oil in a state whose law voids provisions in drilling contracts that indemnify parties against their own negligence. Wanting to exploit Louisiana oil but not be bound by the laws of the Louisiana oilfield, these sophisticated parties contracted for Texas law to apply instead.[5] Whether this would prove an effective or successful strategy remained to be seen. Under these circumstances, the parties' oilfield indemnity provision may be a strong indication of their agreement, hope, and desire, but it does not necessarily reflect their justified expectations. Nor does the parties' oilfield indemnity provision compel the majority's conclusion that we cannot disregard the indemnity language the parties chose and the insurance they agreed to purchase in order to make their indemnities enforceable. *Ante,* op. at p. 176. Applying that

logic, one might just as easily argue that we should also enforce illegal contracts (which the law also views as void) lest we disappoint the expectations of the parties who crafted them.

In cases such as this, the parties' attempt to avoid the oilfield laws of the state where the oilfield operations are conducted does not necessarily translate into a justified expectation. Chesapeake and Nabors might well have expected that, notwithstanding their efforts to bring another state's oilfield statutes to the Louisiana oilfield, the court hearing this dispute would refuse to enforce the oilfield indemnity in light of Louisiana's Oilfield Anti–Indemnity Statute and the strong public policy that underlies it. As Justice Wittig points out in his dissent, the parties to a drilling contract for a well in Louisiana can reasonably anticipate that Louisiana law might apply to issues arising under their contract. Certainly, it would not be unreasonable for them to expect that Louisiana law might apply despite their having "drafted indemnity clauses and purchased insurance to meet ... Texas law." *Ante,* op. at p. 176.

Whatever the parties' true expectations were with respect to the oilfield indemnities in this case, those expectations must yield when the "value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied." *See* Restatement (Second) of Conflict of Laws § 188 cmt. (b), at 577. Though it is especially difficult to disregard a bargain con-

---

**5.** The majority asserts that the only reason for a choice-of-law clause is to avoid application of some other law. *See ante,* op. at p. 178, n. 29. Though that may be a motivating factor in many cases, there are other reasons for including such clauses in contracts, for example, to avoid uncertainty about which jurisdiction's law will apply when a contract involves

contacts with many different jurisdictions. *See DeSantis,* 793 S.W.2d at 677. Nevertheless, even if we presume that the only reason Nabors and Chesapeake included the choice-of-law provision in their drilling contracts was to avoid the application of Louisiana law, that still does not settle the justified expectations issue.

tracting parties have struck, it is even more difficult to honor it when doing so would trample on a sister state's sovereign right to establish and enforce public policy within its own borders. As discussed more fully in the sections that follow, Louisiana, like Texas, has a strong and compelling interest in regulating activity in its oilfields. That interest outweighs the value of protecting expectations of parties in the enforcement of a contractual provision Louisiana's law declares void. In this context, even if it were proper to consider the parties' choice of Texas law in this part of the analysis, and even if the insurance, indemnity, and choice-of-law provision could be fairly characterized as a justified expectation of the parties that Texas law would govern, the balance still tips in favor of applying Louisiana law.

Regarding the seventh principle in section 6 of the Restatement, the majority claims the *Maxus* court held that the "ease of determination and application of the law" points to applying the law of the state where the injured party brought suit. *See ante,* op. at p. 177–78; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(g). The *Maxus* court did not so hold; rather, it stated that "Kansas law is easily determined and applied." *Maxus Exploration Co.,* 817 S.W.2d at 57. The majority states that this seventh principle cannot be known with certainty until the injured party files suit. The majority implies that this principle supports its analysis based on factors that cannot be determined until the injured party sues the indemnitee, e.g., the majority's interpretation of place of performance and location of the contract's subject matter. This principle does not support the majority's position.

The Restatement says only the following about the seventh principle: (1) it expresses the goal that conflict-of-laws rules (not the substantive law chosen under these

rules) should be simple and easy to apply; and (2) this principle should not be over-emphasized, because it is obviously of greater importance that the conflict-of-laws rules lead to desirable results. RE-STATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)(g) & cmt. (j). Because this principle expresses only the need for simple and easy-to-apply conflict-of-laws rules, it can be applied at the time of contracting and does not support the majority's analysis. *See NL Indus., Inc. v. Commercial Union Ins. Co.,* 65 F.3d 314, 328–29 (3d Cir.1995) (seventh principle deals with simplicity of conflict-of-laws rules); *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594, 616 (7th Cir.1981) (same). Although this court has not addressed the issue in a published case, this interpretation of the seventh principle is the only one that comports with the plain language of the comment to section 6 of the Restatement. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6, cmt. (j).

The Texas Supreme Court did not explain why it concluded that Kansas law could be easily determined and applied in the *Maxus* case. It may have been referring to the simplicity of its conflict-of-laws analysis or to the simplicity of determining applicable Kansas law. *See Maxus Exploration Co.,* 817 S.W.2d at 57. If, as the majority concludes, the *Maxus* court viewed this seventh principle as referring to the ease in determining the substantive law of Kansas, it still would not affect the analysis in this case because Texas courts would have no difficulty applying the law of a bordering state like Louisiana. Indeed, Texas courts have had no trouble determining and applying the substantive law of foreign countries such as Turkey, Turkmenistan, and Taliban-era Afghanistan. *See, e.g., Falcoal, Inc. v. Turkiye Komur Isletmeleri Kurumu,* 660 F.Supp. 1536, 1541–42 (S.D.Tex.1987) (applying Turkish law); *Bridas Corp. v. Unocal*

*Corp.*, 16 S.W.3d 893, 900–06 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (applying laws of Turkmenistan and Afghanistan and stating that the laws of these countries can be readily and reliably ascertained). Surely, then, if the majority is correct in concluding that this seventh principle of section 6 means the ease of determining the substantive law, it would be entitled to almost no weight. And what little weight the court could legitimately accord it would hardly tip the balance in favor of applying Texas law. Therefore, the seventh principle of section 6 does not support the majority's analysis.

Today's decision also creates other problems and incongruities in the conflict-of-laws analysis. As explained above, if the place of performance and location of the contract's subject matter is where the indemnitee is sued, as the majority holds, then these factors point to no particular state under the conflict-of-laws analysis.[6] *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 cmt. (e), at 580; *accord Hebert,* 618 F.Supp. at 772. If the RESTATEMENT (SECOND) OF CONFLICT OF LAWS is properly applied to the majority's analysis, these important factors will be absent from the section 188 analysis for indemnity issues. Therefore, the majority's conflict-of-laws analysis for indemnities is really based on only three of the section 188(2) factors. In most cases, including the two involved in this consolidated appeal, these three factors reduce down to a single factor—the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2). This "citizenship analysis" does not promote certainty, predictability, or uniformity of result in this area of the law. In-

stead, the majority's analysis only creates problems, as shown by Justice Wittig's dissent.

For example, if a Texas contractor entered into a drilling contract with an Oklahoma operator and that contract contained indemnities and no choice-of-law provision, the citizenship analysis under section 188 would hold that the Texas Oilfield Anti-Indemnity Statute applies, even if the contract were for a well in Louisiana (because the place-of-performance and location-of-the-subject-matter factors do not apply inasmuch as the parties could not have known where any indemnitee would be sued). This result is contrary to the Texas Supreme Court's territorial approach to anti-indemnity statutes under section 188. *See Maxus Exploration Co.,* 817 S.W.2d at 57. Furthermore, what if the Texas contractor assigns the contract to a Louisiana contractor and the indemnities are enforceable under the Texas anti-indemnity statute but not under the Louisiana anti-indemnity statute? Under the well-established principle that an assignee receives the full rights of the assignor, the Louisiana contractor should receive the enforceable indemnities contained in the drilling contract that its predecessor assigned to it. *See Jackson v. Thweatt,* 883 S.W.2d 171, 174 (Tex.1994). The citizenship analysis forces courts either to violate the well-settled principle that the assignee receives the full rights of the assignor or allow parties to evade anti-indemnity statutes by assignment. The latter would frustrate, not further, the policies of states with anti-indemnity statutes. *See* LA.REV.STAT. ANN. § 9:2780 (West 1991); N.M. STAT. ANN. § 56–7–2 (Michie 2001); TEX. CIV. PRAC. & REM.CODE § 127.001, *et seq.;* WYO. STAT. ANN. § 30–1–131 (Michie 2001).

---

**6.** Under the majority's approach, this would appear to be the result in every conflict-of-laws analysis for an indemnity provision.

Another inconsistency common to both the majority's approach and the citizenship analysis is that they both would void similar indemnities in subcontractors' contracts based only on the citizenship of the subcontractor. The records in this appeal illustrate as much. They show the following: (1) to perform the work required under its drilling contract for the Burns 7–1(Re) well in Louisiana, Chesapeake entered into subcontracts with various entities, including Reeled Tubing, Inc. ("RTI"), a Louisiana company and Quality Pressure Testing ("QPT"), a Texas company; (2) under applicable master service agreements, Chesapeake's contract with both RTI and QPT contained identical indemnity provisions under which these subcontractors would indemnify Chesapeake against personal-injury claims by their respective employees, regardless of Chesapeake's negligence; (3) these indemnities were similar to the indemnities between Chesapeake and Nabors in the drilling contract; (4) the indemnities in the subcontracts appear to be enforceable under Oklahoma and Texas law but unenforceable under Louisiana law; and (5) the injuries to Alms and Fritz are covered by the respective indemnities from RTI and QPT in favor of Chesapeake. Under the citizenship analysis, the same indemnification provision for work under the same drilling contract on the same Louisiana well would appear to be void and unenforceable in RTI's subcontract (under Louisiana law) but valid and enforceable in QPT's subcontract (under Texas or Oklahoma law), based on the citizenship of the subcontractors.

Another ramification of the majority's section 188 analysis is that it effectively withdraws protections for Texas contractors working in states that have more stringent anti-indemnity statutes than Texas, *i.e.*, Louisiana, New Mexico, and Wyoming. *Compare* LA.REV.STAT. ANN. § 9:2780; N.M. STAT. ANN. § 56–7–2; WYO. STAT. ANN. § 30–1–131 *with* TEX. CIV. PRAC. & REM.CODE § 127.001, *et seq.; see also Maxus Exploration Co.*, 817 S.W.2d at 57. Under the Texas Supreme Court's territorial approach in *Maxus*, Texas contractors enjoy the protections provided by these states' anti-indemnity statutes as to oilfield contracts for wells in these states. *See Maxus Exploration Co.*, 817 S.W.2d at 57. But, under the majority's citizenship approach, Texas contractors no longer will enjoy the protections enacted by the legislatures of these states, unless one of the other parties to the contract is a citizen of the state where the well is located. Although the majority's approach arguably would increase protection of Texas contractors in states like Oklahoma, by extending the Texas Oilfield Anti–Indemnity Statute into that state for work performed by Texas contractors, it is likely to decrease protection for Texas contractors in other states. Given the large volume of oilfield work in Louisiana and offshore Louisiana, as well as the work performed in New Mexico and Wyoming, the net effect of today's decision will almost certainly be a decrease in protection of Texas contractors from the sort of evils the majority concedes were declared against the public policy of both Texas and Louisiana.[7]

7. Of course, our function is not to question the wisdom of the anti-indemnity statutes; rather, we must apply them as written. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000); *Lee v. City of Houston*, 807 S.W.2d 290, 293 (Tex.1991). Several parts of the majority opinion indicate that the majority views these statutes with disfavor. For example, the majority speculates that the Texas Supreme Court favored Kansas law in *Maxus* to avoid invalidating the indemnity under the Texas Oilfield Anti–Indemnity statute. *See ante,* op. at p. 175. The *Maxus* opinion contains nothing that would support

Though the learned justices in the majority find this point perplexing, there is no denying the rippling effects of the majority's citizenship-based analysis. Nor is there any escape from the incongruities it produces.

More importantly, as pointed out in Justice Wittig's dissent, focusing on the citizenship of the parties is contrary to the Texas Supreme Court's approach in *Maxus*. Our high court rejected a Texas party's plea for the application of the Texas Oilfield Anti–Indemnity Statute to an indemnity in a drilling contract negotiated and executed in Texas between two Texas parties. *See Maxus,* at 51–57. The majority opinion states that the Texas and Louisiana anti-indemnity statutes apply to all oilfield contracts everywhere, regardless of where the company or well is located. Neither statute expressly addresses its territorial reach. Nonetheless, the Texas Supreme Court has expressly addressed this issue as to the Texas statute:

> One can argue that the Texas Legislature's purpose in enacting [the Texas oilfield anti-indemnity statute] is to protect Texas *contractors* who work on mineral wells and mines wherever they may be situated, but we think it more plausible that it had the more limited objective of protecting contractors who drill wells in Texas. We do not read the statute to have an extraterritorial reach, absent some agreement between the parties.

*See Maxus Exploration Co.,* 817 S.W.2d at 57 (emphasis in original). For purposes of the section 188 analysis in this case, we must ignore the choice-of-law provision, and therefore, we also must ignore the Texas Supreme Court's reference to the possibility of an enforceable choice-of-law provision. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b); *see also DeSantis,* 793 S.W.2d at 678.

The citizenship analysis and all the mischief it invites can be avoided by adhering to the territoriality approach—the Texas Supreme Court's approach in *Maxus. See Maxus Exploration Co.,* 817 S.W.2d at 57. Consistent with section 188 and the comments thereto, this approach assigns primary importance to the place of performance of the drilling contract (Louisiana) and the location of the contract's subject matter (Louisiana). It also presumes that oilfield anti-indemnity statutes were intended to cover all wells in that state (Louisiana) and not to cover wells outside of the state, absent a choice-of-law provision enforceable under section 187. *See id.* Though the majority initially acknowledges that this approach would be easier to apply, our esteemed colleagues ultimately conclude that this approach is not as simple as it might appear and that there are potential problems with determining the place of performance of master service contracts. These concerns notwithstanding, courts have had no difficulty applying Texas conflict-of-laws principles and determining the place of performance in situations involving master services contracts. *See, e.g., Hebert,* 618 F.Supp. at 772–73. In any event, any difficulty courts might encounter in grappling with these matters seems a small price to pay for some measure of certainty and predictability in the enforceability of oilfield indemnities. The majority's section 188 analysis is a significant step away from the Texas Supreme Court's approach in *Maxus* and a clear departure from the certainty, predictability, and uniformity of result that approach tends to foster.

---

this speculation and, in any event, this court should decide this case without regard to any view it may have of the wisdom of anti-indemnity statutes. *See Nat'l Liab. & Fire Ins. Co.,* 15 S.W.3d at 527; *Lee,* 807 S.W.2d at 293.

### Application of Texas law would be contrary to a fundamental policy of Louisiana.

The majority strains to conclude that, even if Louisiana law would be applied under section 188, the choice of Texas law still prevails because Texas law does not contravene any policy of Louisiana. This conclusion is based on the dubious notion that the policies of the Louisiana and Texas anti-indemnity statutes are the same. The majority presumes that Louisiana's policy regarding its oilfield anti-indemnity statute is fundamental, as required by section 187(2)(b); however, the majority implausibly concludes that the policies of Texas and Louisiana in the area of oilfield indemnities are equivalent. The majority bases this conclusion on the similarity between section 127.002(a) of the Texas Civil Practice and Remedies Code and the first sentence of section 9:2780(A) of the Louisiana Revised Statutes. *See* Tex. Civ. Prac. & Rem.Code § 127.002(a); La.Rev.Stat. Ann. § 9:2780(A). The majority, however, does not address the second sentence of section 9:2780(A), which also states the relevant Louisiana policy:

> It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

La.Rev.Stat. Ann. § 9:2780(A). Under this second sentence, the Louisiana legislature articulates Louisiana's fundamental policy against enforcing indemnities for personal injury where there is negligence, fault, or strict liability on the part of the indemnitee. *See id.*

Under the unambiguous language of the Louisiana statute, the indemnity in favor of Nabors contravenes the fundamental policy of Louisiana if Nabors had any negligence, fault, or strict liability in causing the personal injuries to Fritz or Alms. As the majority points out, the jury found Nabors negligent in the *Fritz* case, and Nabors has not shown that it was free from negligence in the *Alms* case. For the purposes of this appeal, we must presume that Nabors was at fault and that indemnity in favor of Nabors violates the Louisiana Oilfield Anti–Indemnity Statute. *See* La.Rev.Stat. Ann. § 9:2780. Therefore, the indemnity in favor of Nabors also violates Louisiana's fundamental policy as stated in this statute. *See id.* at 9:2780(A). As the majority acknowledges, the application of Texas law would result in the enforcement of this indemnity. The inescapable conclusion is that the application of Texas law to the indemnity in favor of Nabors would be contrary to a fundamental policy of Louisiana. The majority's conclusion to the contrary is ill-founded.

Moreover, it is no answer to say the policy of the two states is the same and that it is only the means of implementing the policy that differs, particularly when those different means yield entirely different ends. Even the most ingenious application of the Restatement test does not permit us to embrace the stated policy (or some portion of it) as identical to our own and simultaneously reject the means our sister state's legislature crafted to implement the policy. That approach offends the letter as well as the spirit of the Restatement test the Texas Supreme Court has adopted for resolving conflict-of-laws issues. *See DeSantis,* 793 S.W.2d at 677–78.

*Louisiana has a materially greater interest than Texas in determining these issues.*

The majority concludes that Louisiana does not have a materially greater interest than Texas in determining Louisiana oilfield indemnity issues. After referring to its analysis under section 188, the majority discusses two possible purposes of the Louisiana Oilfield Anti–Indemnity Statute and one possible purpose of the Texas Oilfield Anti–Indemnity Statute. None of these three possible statutory purposes are mentioned in these statutes or in any cited legislative history. There is no value in speculating about possible purposes for these laws that are not reflected in the statutes. *See Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000).

If this court determined that Louisiana law would apply under section 188 in the absence of a choice-of-law provision, and that the application of Texas law would be contrary to a fundamental policy of Louisiana, then it almost certainly would conclude that Louisiana has a materially greater interest than Texas in determining whether the oilfield indemnity provisions in this case are enforceable. The Texas Supreme Court has adopted a territorial approach to anti-indemnity statutes and has indicated that the place of performance is of great importance in service contracts like the drilling contract at issue in this case. *See Maxus Exploration Co.,* 817 S.W.2d at 51–57. The territoriality concept woven through *Maxus* recognizes that the place where the contract is to be performed has a substantial interest in the resolution of legal issues relating to that performance. *See id.* After all, every state has the right to define its own fundamental public policy and to set the ground rules for implementing it, and it is this right to govern conduct and set policy within its own borders—*and in its own oilfields*—that makes its interest materially greater than another state's interest.

It is hardly debatable that Louisiana has a keen interest in making the rules that govern oilfield operations on its lands and in protecting contracting parties engaging in drilling operations there. Given these considerations, the court should find that Louisiana has a materially greater interest than Texas in determining these issues. *See DeSantis,* 793 S.W.2d at 679 (holding that, under § 187(2)(b), Texas—the place where services were performed—had a materially greater interest in determining whether to enforce the noncompetition agreement). Certainly, the citizens of this state can only hope that Louisiana courts would do the same if the roles were reversed. Undoubtedly, more than a few Texas feathers would be ruffled were Louisiana courts to declare that Louisiana has a materially greater interest in Texas oilfield drilling contract issues than Texas. Indeed, if the Texas legislature passed a law that rendered certain contracts covering activity on Texas soil void and unenforceable for fundamental policy reasons, would it advance our state's policy to allow those contracts as long as the parties went beyond our borders to enforce them? No. Would a neighboring state have a materially greater interest in those contractual issues just because the enforcement actions landed there? No. Louisiana has the greater interest in making the rules for operation of Louisiana oilfields, including rules for such things as oilfield indemnities. This territoriality approach not only follows our high court's path in *Maxus,* it preserves the important principle of comity regarding other states' laws, a principle compromised by the court's decision today.

For the reasons stated above, this court should reverse and remand the granting of the motion for summary judgment in Cause Number 14–00–00173–CV, the *Alms*

appeal, and affirm the denial of Nabors's cross-claim in Cause Number 14–00–00580–CV, the *Fritz* appeal.

RICHARD H. EDELMAN, Justice, dissenting.

Of what use is a principle of law if no one can be certain, or even confident, of its meaning? How can people obey it? How can businesses enter into contracts to which the law applies with any expectation that they will be enforceable, let alone profitable? If the meaning of a law is uncertain, is it law at all?

This case involves a single sentence of a contract, the plain meaning of which is simple and undisputed. Yet, because our courts choose to apply the provisions of the Restatement on Conflict of Laws to determine whether that choice of law sentence will be given legal effect, the time and resources for extended litigation and over fifty pages of en banc opinions of this court have had to be expended *so far* just to give the parties a deeply divided en banc decision as to whether that one sentence of their contract will be enforced as they agreed *in this instance*. Because of reliance by the courts on the Restatement's method of weighing interests, policies, and relationships, successive court decisions over the years have done little to make the resolution of this issue more uniform or thereby lessen the need for litigation over it.

Ultimately, the interests to be balanced are straightforward: contracting parties' right to choose the law governing their transactions versus states' sovereign right to govern business activities conducted within their boundaries. The Restatement approach allows these respective interests to carry greater or lesser weight in different contexts depending on the circumstances (and thus practically assures that courts will reach inconsistent results).

But should they? If a state has the sovereign power to govern contracts pertaining to some activities conducted within its boundaries, how and why does it not have that power over all activities conducted within it (that are not governed by federal law)? Moreover, to the extent that the legislative body and courts of a state have promulgated the laws to be followed in that state, how can the courts of another state presume to decide, as the Restatement method contemplates, that some of those laws are important enough to be enforced with regard to activities in that state, but others are not? And why is adherence to the Restatement approach so essential that such uncertainty in the law, and thus a lack of law, is tolerated to perpetuate it?

To be sure, the uncertainty surrounding this issue is completely the contracting parties' doing. As reflected in the majority and other dissenting opinions in this case, the Restatement provisions essentially provide that the choice of law made by the parties will be honored unless there is a more compelling reason to apply the law of the state where the problem arose. Obviously, if parties want certainty, they can simply specify that their contracts will be governed by the law of the state in which the event giving rise to the indemnity obligation occurs. The Restatement provisions will rarely, if ever, override that choice of law. Therefore, it is only because parties wish to gamble on selecting the law of a different state that uncertainty is encountered. But should we allow parties to repeatedly deplete public resources to decide this wager for whichever of them happens to be benefitted by it in each particular case? And should such an involved decision-making process be continuously conducted only to reach inconsistent and thus arbitrary determinations? Surely, the Restatement method is not

really the best that we, as judges, can do with such a fundamental and pervasive question. If we cannot decide that the law of each state governs all, and not merely some, of the activities conducted there (that are not subject to federal law), then we can at least devise an approach that produces some other predictable result so as not to continue to tie up the courts with this issue.